## MEANS et al. v. LIMPIA ROYALTIES et al.

### No. 13675.

Court of Civil Appeals of Texas. Fort Worth.

Feb. 18, 1938.

Rehearing Denied April 1, 1938.

Samuels, Foster, Brown & McGee, of Ft. Worth, for appellants.

Ira J. Butler, of Fort Worth, W. C. Franklin, of Tulsa, Okl., and Saner, Saner & Jack, of Dallas, for appellees.

DUNKLIN, Chief Justice.

This suit was instituted by Mrs. Arclissa C. Means, a feme sole, and Mrs. Elizabeth Armstrong, joined by her husband, O. C. Armstrong, against the Limpia Royalties, an unincorporated association, operating under a declaration of trust, organized under the laws of the state of Oklahoma, and with its principal office in the city of Tulsa, and W. E. Templeman and N. E. Templeman, residing in Tulsa county, Okl., and Sam F. Means, residing in El Paso county, Tex., trustees of said association, for rescission and cancellation of a certain deed executed by J. S. Means, deceased, and his wife, A. C. Means, one of the plaintiffs, conveying to the "Limpia Royalties, a trust estate, Tulsa, Oklahoma," an undivided one-sixteenth interest in and to all of the oil, gas, and other minerals, in and under, and that may be produced from, 22,767 acres of land situated in Andrews county, Tex., subject to the terms of an oil and gas lease then outstanding against the land, with reservation to the grantors of rentals accruing under that lease, but with the right of the grantee to an undivided one-sixteenth of rentals accruing on any future lease, in the event of cancellation or forfeiture of the lease now outstanding. It was alleged in the petition that J. S. Means is now dead; that the land described in the conveyance was in part the separate property of the deceased and in part the community property of himself and plaintiff, Mrs. Arclissa C. Means, and that she and plaintiff, Mrs. Elizabeth Armstrong, are the sole devisees of his will, which has been duly probated; and further, that the two devisees were named as independent executrices of the will. And this appeal is by plaintiffs from the judgment of the trial court, sustaining a general demurrer to their petition and dismissing their suit.

Attached to the petition as an exhibit is a copy of the agreement creating the trust

designated as "Limpia Royalties," executed and duly acknowledged in Tulsa, Okl., on March 15, 1930, by W. E. Templeman, Cross D. Payton, Sam F. Means, N. E. Templeman, and Burnett Goss; also a copy of the deed, duly executed and acknowledged by J. S. Means and wife on September 29, 1930. The declaration of trust is as follows:

"Know All Men By These Presents:

"That the undersigned, W. E. Templeman, N. E. Templeman and Burnett Goss, all of Tulsa, Oklahoma, Sam F. Means, of El Paso, and Cross D. Payton, of Abilene, Texas, have agreed, each with the other, to and do hereby create a Trust, to be known and designated as 'Limpia Royalties,' in which name the Trust may acquire, hold and transfer title to property, sue and be sued, and transact all business for which it is created.

"We do hereby designate and appoint ourselves as Trustees of such Trust, and severally accept such Trusteeship, with full authority to hold and exercise the rights and powers, and with the obligation to perform the duties provided for in this instrument. Neither the Trustees, jointly, nor either of them severally, shall ever be personally liable for any debt, obligation, or demand against the Trust, the property of the Trust, of the Trustees, or either of them in their capacity as such Trustee, or Trustees, or arising out of any business transaction or activity on behalf of the Trust or the ownership of any property comprising the Trust Estate, nor shall the Trustee or either of them ever be personally liable for any act or omission of any officer, agent, or employee of the Trust.

"Certificate entitling the owners thereof to participate ratably in any distribution of the profits of the Trust, and in a distribution of its assets upon termination of the Trust, shall be issued as herein provided. The owners of all such certificates may only acquire, accept and own same subject to and in accordance with the provisions of this instrument and any amendment thereof. The ownership of such certificate shall not entitle the owner thereof, as such, to have or claim title to or in any of the property of the Trust; or the right to call for a partition or division of such property; or a termination or dissolution of the Trust; or for an accounting; nor shall any such owner have any control over the Trust property or the conduct of its business. Neither shall the owner of any such certificate be per-

sonally liable as such, for any debt, obligation or demand created by the Trustees, or either of them, or by any officer, agent or employee of the Trust, or arising out of any business transaction on behalf of the Trust, or the ownership of any property comprising the Trust Estate.

"Any and all contracts made by or on behalf of the Trust or the Trustee thereof, or their successors in office, shall expressly provide that neither the individual holders of beneficial interests, or any of them, nor the Trustees hereof, nor either of them, shall ever be held liable for any of the debts or obligations of this organization, but that all persons, firms or corporations dealing with this organization, or contracting therewith, shall look only to the assets of the organization for any demand arising under such contract, or otherwise, against this organization, or its Trustees as such.

"Subject to the foregoing provisions, this Trust Agreement shall be in accordance with and upon the following terms, conditions and provisions, which shall bind the Trustees aforesaid, and their successors, the owners of all shares of beneficial interests in the Trust, issued hereunder, and all parties, firms and corporations dealing with said Trust, the Trustees thereof, and dealing with the officers and agents of the Trust.

"1. The Trust Estate shall be divided into Ten Million beneficial interests, which shall be known as shares, each share to be of the expressed or nominal value of One Dollar ($1.00). Ownership thereof shall be evidenced by certificate, or certification, on the form hereinafter provided, and shall be negotiable. Certificates for shares shall be issued from time to time as may be authorized by the Trustees, or a majority of them then in office, and certificates may be issued for cash, in exchange for property, for services rendered, or for such other consideration and upon such terms as said Trustees may authorize and deem proper. Certificates shall be signed in the trust name of 'Limpia Royalties,' by the President, countersigned by the Secretary, and certificates, when issued, so signed and countersigned, shall be binding upon the Trust, the Trustees thereof, and all persons interested in the Trust.

"A permanent report shall be kept by the Secretary, at the office of the Company, of certificates issued. The certificates shall only be transferable on the books of the Trust, kept for that purpose by the Secretary, and the person in whose name a certificate stands on the books of the Trust

shall be conclusively considered to be the absolute owner of such certificate, and shall alone be entitled to the rights and benefits evidenced thereby. Any tax that may be charged by any State or the Federal Government upon the transfer of any share or shares in the Trust shall be paid by the shareholder transferring same and the amount thereof deposited with the Secretary of the Trust before he shall be required to enter such transfer on the books or records of the Trust.

"Certificates evidencing ownership of shares in the Trust shall be in the following form:

"Shareholder's Certificate.

"Certificate No. ———    Par Value $1.00

"Limpia Royalties,

"A Trust Estate.

"This certifies that ——— is the owner and holder of ——— shares, fully paid and non-assessable, of a total of 10,000,000 authorized shares of beneficial interests in Limpia Royalties, subject to the written agreement and declaration of trust under and by virtue of which said organization was created, made by ———, Trustees, dated ———, and recorded in Book ———, page — of the records of the office of the County Clerk, ——— County, Oklahoma, on the — day of ———, 1930. All the terms of said agreement and declaration of trust are, by reference, made part hereof and expressly assented to.

"The holder hereof has no interest legal or equitable in any specific property and the interest hereby represented can be transferred only by due endorsement and surrender hereof and transfer noted on the books kept for that purpose by the Trustees or their agent.

"In witness whereof, this instrument is executed in the name of said Trust by its ——— President, attested by its Secretary, this the ——— day of ———, 193—.

"Limpia Royalties,

"By ———

"——— President

"———,

"Secretary.

"2. The Trustees herein named, or their successors, in Trust, who shall be in office from time to time, shall hold the legal title to all property of the Trust, which property shall be acquired and held by said Trustees under the name and designation of 'Limpia Royalties.'

"3. W. E. Templeton, Trustee aforesaid, shall be President of the Trust, and as such, shall in general supervise and look after the business and affairs of the Trust, and any contract entered into on behalf of the Trust, and any instrument of lease, sale, transfer or assignment of any property of the Trust, executed in its Trust name of 'Limpia Royalties,' by the President, and his signature attested by the Secretary, shall be in all things binding upon the Trust and the Trustees thereof, and upon all persons interested therein, in favor of all parties claiming under or by virtue of such instrument, and, so far as the interest of any third party is concerned, the Trustees, for themselves and successors in Trust, expressly ratify and adopt any such instrument. The President herein designated shall continue to act and remain as such until his resignation, or until he shall be replaced by a majority of the Trustees by an instrument in writing deposited with the Secretary designating another of the Trustees to act as President. Compensation of the President shall be fixed by the Trustees, or a majority of them, and may be changed from time to time.

"4. Cross D. Payton and Sam F. Means, Trustees, shall be Vice-Presidents of the Trust, and either, in the absence of the President, shall perform all of his duties, and the acts of either shall have the same force and effect as though done by the President. If a vacancy in the office of the Vice-President shall arise it may be filled in the same manner as in the office of the President. Compensation of the Vice-President shall be fixed as in the case of President.

"5. The Trustees, or a majority of them, shall, in writing, select a Secretary of the Trust, who shall continue to act as such until his successor is in like manner selected. A trustee may, but need not be, named as Secretary. The secretary shall attest all instruments executed in the name of the Trust by the President, shall keep a record of all proceedings of the Trustees in the transaction of the business of the Trust, the appointment of officers and agents thereof, and shall perform other duties as shall be imposed upon him from time to time by its Trustees or a majority thereof. Compensation of the Secretary shall be fixed in the same manner as that of the President.

"6. The Trustees, or a majority of them, may, in writing, deposited with the Secre-

tary, name one or more Assistant Secretaries of the Trust, who shall continue as such until a successor is, in like manner, selected. The Assistant Secretary, or Secretaries, or either of them, may, but need not be, a Trustee. In the absence of the Secretary, the Assistant Secretary or either of them, shall perform all of the duties and have all of the powers and authority of the Secretary and the acts of any Assistant Secretary shall have like force and effect as the acts of the Secretary. Compensation of the Assistant Secretaries shall be fixed by the Trustees, or a majority of them.

"7. The Trustees, or such as are in office from time to time, shall have the management and control of the business and property of the Trust, and the acquisition and disposal of such property. They shall appoint the Executive officers thereof, and the successors to such officers. The resignation or death of a Trustee shall not terminate this Trust, but the remaining Trustees, or if there be only one, the single Trustee, shall, by instrument in writing duly subscribed and deposited with the Secretary, fill such vacancy or vacancies, as soon as may be convenient or practicable. They shall, from time to time, designate the depository or depositories for all funds of the Trust, which funds shall be deposited in the name of 'Limpia Royalties,' and may be withdrawn by check or order, signed in said Trust name by the President or a Vice-President, and countersigned by the Secretary or Assistant Secretary.

"8. The object of this organization is to enable parties who desire to invest in oil, gas and mineral properties, by acquiring shares in the Trust, to spread such investments over a very much larger territory than would ordinarily be possible for such investors to do individually, thereby increasing the opportunity or likelihood of the investors becoming interested in properties that are or may become valuable for the production of such minerals and of receiving revenue and profits from same. Therefore, the purposes of this Trust are, through the Trustees, to purchase or otherwise acquire oil, gas and other minerals, and mineral estates in lands, in whole or in part; together with rights pertaining thereto, in such form and upon such terms and conditions and for such consideration as to the Trustees may seem proper, and own, hold, sell, lease, trade in and for, and otherwise deal in and dispose of, such property or any part thereof, or interest therein, upon such terms as to the Trustees may seem proper.

"To purchase or otherwise acquire, own, care for, utilize, sell and otherwise deal in and dispose of, such other rights or property, upon such terms and in such form as to the Trustees may seem necessary or proper in connection with the purposes mentioned in the paragraph above.

"To receive and collect all sums at any time becoming due the Trust, and to invest its capital or any portion thereof, or any funds of the trust, in such property or rights, upon such times and in such form as may, from time to time, be deemed proper by the Trustees.

"To prosecute all actions on behalf of the Trust, or the Trustees, and defend all actions against it, or the Trustees, and the Trustees may incur and pay all expenses by them deemed proper in regard to any such suit.

"9. The Trustees, or a majority of them then in office, may at any time and from time to time, as they alone deem proper, declare and pay dividends from the earnings of the trust, which shall be distributed among the shareholders ratably in accordance with the number of shares held by each.

"10. The principal office and place of business of the Trust shall be located and maintained at Tulsa, Oklahoma, until changed by the Trustees or a majority of them then in office. Said trustees may establish branch offices at such places as they deem advisable.

"11. This Trust shall remain in force and effect for a period of twenty (20) years after the death of the last subscriber hereto, unless sooner terminated by the Trustees or a majority of them then in office, and said Trustees shall have the right to terminate said Trust at any time they deem it advisable. Upon termination of the Trust by lapse of time or otherwise, the Trustee then in office shall liquidate the assets of the Trust, so far as practicable, and shall distribute the funds and assets, as nearly as may be, ratably among the owners of the shares of Trust, as they appear of record on its books.

"12. The Trustees, or a majority of them then in office, may at any time it seems desirable to do so, organize a corporation for the purpose, among other things, of taking over the entire business and assets of the Trust. In the event such course

is decided upon, the corporation shall be organized in such form and under the laws of such State as may appear most desirable to the said Trustees. Upon the corporation being organized and its charter properly issued, there shall be transferred to it all of the assets of the Trust and there shall be issued by the Corporation, in exchange therefor, its entire authorized common stock, which shall have voting power. Said stock shall be issued ratably to the shareholders of the Trust in proportion to the number of shares in the Trust held by each. All expense incurred in organizing the corporation and obtaining its charter shall be paid from the funds of the Trust.

"13. This agreement may be amended by the Trustees, or a majority of them then in office, at any time and from time to time, by an instrument in writing, signed by said Trustees, setting out the amendment and deposited with the Secretary of the Trust.

"This agreement and any amendments thereof, may be filed for record in such places as the said Trustees may designate.

"14. A Trustee, during his term of office, may acquire, own and dispose of shares in the Trust, to the same extent as if he were not a Trustee. The Trustees, neither jointly nor severally, shall be liable to shareholders for any error in judgment, or otherwise, of the trustees or either of them, in the management or transaction of any business of the Trust, except for their own individual acts or omissions involving bad faith.

"15. Promptly upon execution of this agreement, the undersigned, W. E. Templeman, agrees to transfer and convey to the Trust, by instrument duly executed and acknowledged, and in such form as shall be approved by the other subscribers hereto, an undivided one-fourth interest in and to the oil, gas and other minerals and rights pertaining thereto, in the following tracts of land in Pontotoc County, State of Oklahoma:

"Lot Seven (7), of Section Five (5), Township Five (5) North, Range Five (5) East.

"In full payment for said interest in said minerals and rights above mentioned, the Trustees shall cause to be issued and delivered to said W. E. Templeman, a certificate for 500 shares in said Trust.

"16. It is agreed, and this provision shall bind all persons becoming interested in the Trust, that as compensation to the Trustees herein, their thought and planning of the Trust, the organization of same, obtaining approval of the agreement by the necessary public Boards or Commissions, securing subscribers to share in the Trust, time of the Trustees in and about the matters aforesaid, and to reimburse them for expenses incurred in organizing and floating the Trust, and in general for all preliminary matters in connection with the organization and floating of the Trust, and securing of subscribers thereto, there shall be issued to the Trustees, to be divided among them equally, shares in the Trust in the ratio of one share to the Trustee, for each four shares issued during the life of this agreement, until for said matters the Trustees shall have received a total of twenty per cent of the authorized shares in the trust.

"Also, said Trustees, during the periods specified in this paragraph shall not be paid salaries or compensation in cash for their services as such Trustees in the management and control of the business and property of the Trust, the acquisition of properties for the Trust, and the trading and dealing with same, and in general for their services in and about the business of the Trust, but, as compensation for such services, and in lieu of cash therefor, they shall receive for the period from date hereof to and including June 30, 1930, shares equivalent to three per cent of the total authorized shares of the Trust, to be divided equally among the Trustees, and certificates therefor to be properly issued and delivered to them on or about the last of said period; for the period from July 1, 1930, to and including December 31, 1930, shares equivalent to three per cent of the total authorized shares of the Trust, and certificates thereof shall be issued and delivered to them on or about the date last mentioned; for the period from January 1, 1931, to and including June 30, 1931, shares equivalent to two per cent of the total authorized shares of the Trust, and certificates therefor shall be issued and delivered to them on or about the date last mentioned; and for the period from July 1, 1931, to and including December 31, 1931, shares equivalent to two per cent of the total authorized shares of the Trust, and certificates therefor shall be issued and delivered to them on or about the last named date. In each case the shares shall be equally divided among the Trustees;

provided, should any Trustee cease to hold office at any time before the expiration of either of the periods specified, he shall only be entitled to pro rata part of the shares to be issued at the end of such period, based upon the proportionate part of the total period that he remained in office, and the balance of shares for said period and subsequent periods shall be equally divided among the Trustees remaining in office. If a successor is appointed to any Trustee ceasing to hold office, such successor. shall be entitled to a proportionate part of the balance of said shares so to be issued, for the time during which such successor holds office, commencing, however, only from the date of his appointment.

"After expiration of the periods above specified, compensation to the Trustees for their services in the management of the business of the Trust, etc., as above mentioned, shall be computed and paid as follows:

"A sum equivalent to Ten per cent of each dividend declared from the profits of the Trust shall be set aside for the Trustees, and paid to them when the dividend is paid to the shareholders. The sum set aside for the Trustees at the time each dividend is declared shall be in full for their compensation as such Trustees for the period from the last payment to them, either in cash or stock, up to the date the dividend is declared, and shall be distributed among the Trustees proportionately, to the time each held office during such period.

"17. This agreement is entered into in quintuplicate, each executed instrument to be an original, at Tulsa, Oklahoma, on this the 15th day of March, 1930, and the instrument and the rights and obligations of the subscribers hereto and of all persons becoming interested in said Trust, shall be construed in accordance with the laws and rules of decision in force in the State of Oklahoma.

"[Signed.]  W. E. Templeman
"Cross D. Payton
"Sam F. Means
"N. E. Templeman
"Burnett Goss."

According to allegations in plaintiffs' petition, J. S. Means and wife received 12,-000 shares in the "Limpia Royalties" in the form prescribed in the declaration of trust, as a consideration for their deed of conveyance to the "Limpia Royalties," noted above.

Since the general demurrer admits the truth of the allegations of facts in plaintiffs' petition, the following is submitted as a summary of the principal facts upon which the cancellation is sought, and which must be treated as true:

For the purpose of inducing the execution of the deed, the trustees made false and fraudulent representations, which J. S. Means and wife believed and relied on to be true, and were thereby induced to execute the deed, in substance and effect, as follows: First, the makers of the deed could never be held liable in law for any of the debts or other obligations of the trust or its trustees, by reason of their ownership of the 12,000 shares issued to them as a consideration for the deed. Second, one of the material inducements causing the execution of the deed was the representation and promise made by the trustees at the time the deed was executed that, in accordance with their plan of procedure, it would acquire additional mineral rights in other lands until 8,000,000 other shares were exhausted, thereby giving to the owners of the land deeded increased prospective profits from such other investments, in addition to the expected profits from the 12,000 shares they received when the deed was executed; which promise was made by the trustees with no intention at the time to perform it. Third, up to the time of the trial the trustees had issued less than 500,000 shares of stock under the provisions of the declaration of trust, and had abandoned any intention to acquire any further mineral rights in furtherance of the purposes for which the trust was created, as shown in said declaration of trust.

In connection with the foregoing, plaintiffs allege that since, under the laws of the state of Texas, Vernon's Ann.Civ.St. art. 6133 et seq., the ownership of shares of stock in an unincorporated joint-stock association, such as created by the declaration of trust, carries with it partnership liability for debts of the association, contrary to the representations of the trustees above mentioned, although made by them in good faith, the deed of conveyance sought to be canceled never became effective, for lack of a meeting of the minds of the parties, and through mutual mistake, with respect to the legal liability of the stockholders, their heirs and assigns, for debts that the trustees may incur, throughout the duration of the trust, even for 20

years next after the death of the last survivor now living.

■ It is well settled in this state by a long line of decisions that a shareholder in an unincorporated or joint-stock association is liable to its creditor for debts of the association; his liability being that of a partner. 25 Tex.Jur. § 20, p. 202, and authorities there cited.

■■ The fact that, under the laws of the state of Oklahoma and under the provisions of the declaration of trust, a shareholder in the Limpia Royalties could not be held liable for the debts or obligations of the association would not operate to extend the same immunity from liability growing out of transactions by the association in the state of Texas, since, as is well said in the opinion in Ayub v. Automobile Mortgage Company, Tex.Civ.App., 252 S.W. 287, 290, "The established public policy of the forum is supreme, and will not be relaxed upon the ground of comity to enforce contracts which contravene such policy, even though such contracts are valid where made." That announcement is well supported by many authorities, including Consolidated Garage Co. v. Chambers, 111 Tex. 293, 231 S.W. 1072; Union Trust Co. v. Grosman, 245 U.S. 412, 38 S.Ct. 147, 62 L.Ed. 368; Taylor v. Leonard, Tex.Civ.App., 275 S. W. 134; 12 Corpus Juris 438. Nor do we believe it makes any difference that under the provisions of the declaration of trust it is made the duty of the trustees, in entering into any contract incurring indebtedness of the association, to specifically provide therein for immunity from liability of the shareholder for such debt, for there is no definite assurance that they would so provide in such contracts; and, furthermore, an implied liability of the association might grow out of certain transactions by the trustees, without any specific contract therefor.

■ Under the circumstances alleged in plaintiffs' petition, the misrepresentation made to J. S. Means and wife, that they could never be held liable in this state for any obligation of the trustees or of the association, was a material misrepresentation, which would furnish a basis for cancellation of the deed, if the grantors believed the same to be true and were induced thereby to execute the deed.

Appellees insist that such misrepresentation, being one of law and not of fact, and having been made in good faith, as alleged in plaintiffs' petition, cannot be relied on as a basis for rescission. Many authorities are cited to support this general rule, such as 29 Tex.Jur., § 6, p. 709-10, § 7, p. 712; Campbell v. Jones, Tex.Civ.App., 230 S.W. 710; Richmond v. Hog Creek Oil Co., Tex.Civ.App., 229 S.W. 563; McGary v. Campbell, Tex.Civ.App., 245 S.W. 106; Mitchell v. Small, Tex.Civ.App., 45 S.W.2d 403; Upton, Assignee v. Tribilcock, 91 U.S. 45, 23 L.Ed. 203; Black on Rescission & Cancellation, vol. 1, § 71, p. 174; 26 C.J. § 106, p. 1207.

But in most of the authorities cited it is said that the general rule invoked by appellees is subject to many qualifications and exceptions. In 29 Tex.Jur., § 7, page 712, this is said: "Generally speaking, a mistake by a party as to the legal effect of an agreement which he executes, or as to the legal result of an act which he performs, is no ground for equitable relief. But this rule applies only where the mistake was not induced by fraud, concealment, misrepresentations, undue influence, violation of confidence reposed, or by other inequitable conduct in the transaction. If a person in dealing with another takes advantage of the latter's ignorance of his legal position and rights, equity will exercise its powers to prevent imposition. And, as has been said, a mistake of law caused by the act, language or culpable silence of another will not be permitted by a court of equity to ripen into a gain by that other."

The quotation from Pomeroy's Equity, which follows the above announcement, is to the same effect.

■ O'Dell v. Grubstake Inv. Ass'n, Tex. Civ.App., 38 S.W.2d 151, 152, writ of error dismissed, was a suit to dissolve a common-law trust of the same character as the one in this case, and for a receivership of its assets, for the purpose of assembling its assets and payment of its debts. In the opinion of Justice Smith, concurred in by Chief Justice Fly, this is said: "It is perfectly obvious that all the shareholders executed the trust agreement in the mistaken and controlling belief that the stipulation against the creation of partnership relations or of individual liability of the shareholders for the debts or acts of the association or of the trustees in its behalf would be valid in law, and would effectuate such exemption. The law has intervened to eliminate that stipulation from the contract, under the remaining provisions of which, if enforceable, the managing trustee may proceed at will dur-

476

ing the next eight years to bind all the shareholders, individually, and as unwilling partners, to personal liability for any debt he may see fit to incur, or any act he may perform, in the name of the association. Such a contingency was never contemplated by the parties, whose minds never met in agreement upon the contract as now construed by the courts and insisted upon by appellee, whereby the parties are deprived of the very protection in consideration of which they entered into the agreement actually made. The law having thus emasculated the contract, nullified material and controlling provisions which permeate the entire agreement, destroyed the consideration moving the parties to execute it, and rendered its remaining provisions palpably unconscionable, equity should intervene to terminate the agreement in its entirety and relieve the parties of the unconscionable burdens imposed upon them by the remaining provisions. We conclude that the record presents a case entitling appellants to cancellation of the contract, dissolution of the partnership created by the contract, to an accounting from the trustees, and to a receiver for the purpose of winding up the affairs of the association."

■ In Mason v. Peterson, 250 S.W. 142, 146, this was said, in the opinion of the Commission of Appeals: "Even where there is no element in the transaction sufficient to warrant a finding of legal or constructive fraud, and a misrepresentation is the result of an honest mistake on the part of the seller, the mistake being shared in by the buyer, relief is granted upon the doctrine of mutual mistake, and the same remedies apply as in the case of actual or constructive fraud."

■ To the same effect were decisions in the following cases: Cooper Grocery Co. v. Rowntree, Tex.Civ.App., 260 S.W. 333; Culbertson v. Blanchard, 79 Tex. 486, 15 S. W. 700. In Mason v. Peterson, 250 S.W. 142, 146, in an opinion by Commission of Appeals, this is said: "It has also been held that, where facts are pleaded showing material misrepresentations relied upon by the buyer and inducing the contract, and relief is sought on the ground of fraud, relief may be granted upon the failure of the evidence to show fraud, actual or constructive, upon the ground of mutual mistake, if the evidence will support such finding, even though mistake were not expressly pleaded as the basis for the relief."

■ In Ramey v. Allison, 64 Tex. 697, it appeared that Mrs. Allison, a widow, executed a deed of trust on her homestead, under which the trustee sold the property to Ramey, who then sued Mrs. Allison to recover the property. Mrs. Allison defended on allegations that she was induced to execute the deed of trust by assurance given at the time that its execution was merely a matter of form and would not be binding upon her. The Supreme Court, in that case, said: "Mrs. Allison seeks in her answer to be relieved against her mistake as to the law when she signed the deed of trust. That mistake was superinduced by representations made to her under circumstances, taking into consideration the nature of the legal question involved, which entitle her to protection the same as if the mistake had been as to matters of fact. Her mistake resulted, according to the answer, from the fraudulent and misleading representations made to her as to the state of the law in respect to the vital consideration on which alone she could have been induced to sign the instrument; the case made being one of imposition practiced by a lawyer upon the confiding credulity of a woman inexperienced in law or business affairs. Her ignorance of the law, and his superior acquaintance with it, enabled him to induce her to sign an instrument having the reverse legal effect of that which he had asserted it to possess, and which she supposed it would have. A contract obtained in such a manner is fraudulently obtained, if the representations were fraudulently made and intended to deceive; if not thus fraudulently conceived and intended, they are not the less misleading and inducing a fatal mistake on the part of the party relying on their correctness. In either case, the contract is not that of a person giving consent to it under circumstances that will render it binding in equity. The principles of law laid down in Moreland v. Atchison, 19 Tex. [303] 309, are entirely applicable to this case, which see. Justice Wheeler, delivering the opinion in that case, says: 'The general rule, it has been truly said, is justified by considerations of public policy; and yet so harsh a rule, founded upon a presumption so arbitrary, ought to be modified in its application by every exception which can be admitted without defeating its policy. "If there be, at the time a contract is entered into, a mistake of the law applicable thereto, which en-

tirely modifies it, to enforce such an agreement is to create a new contract which was never assented to understandingly, and to, impose duties and liabilities which the party never contemplated assuming. So, also, if there be a promise, or an actual performance of a contract, upon the supposition of liability, that liability becomes the very basis of the contract, and its non-existence being an utter failure of consideration, an executory or executed contract founded thereupon would, by one of the first principles relating to contracts, be wholly void." ' Story on Con., 407, note."

Kelley v. Ward, 94 Tex. 289, 60 S.W. 311, 312, involved a contract of Ward to purchase certain real estate which was incumbered with a lien. The contract bound Ward to pay the incumbrance, contrary to the understanding of the parties, including their attorneys, that it did not impose that burden. In the opinion of the court, this was said:

"These [referring to the answers of the jury], taken together, show that the instrument was signed under a mistake of all parties to it, none of whom supposed it imposed any personal liability upon Ward to pay the debt. * * *

"The case must, therefore, be decided upon the assumption that the written instrument was made to include the provisions which made Ward liable for the debt by a mistake in which all of the parties participated."

See, also, Emery v. Emery, Tex.Civ.App., 75 S.W.2d 725; Lido Oil Co. v. W. T. Waggoner Estate, Tex.Civ.App., 31 S.W.2d 154, writ of error refused; 7 Tex.Jur. § 29, p. 929.

■ Appellees insist that all the decisions noted above are distinguishable from the present suit by reason of differences of facts and causes of action involved. But it is our conclusion that the principles of equity there announced are applicable and controlling in this case. Nor do we believe that the decisions of the El Paso Court of Appeals in Means v. Limpia Royalties, Tex.Civ.App., 88 S.W. 2d 1080, and Edd Cowden v. Limpia Royalties, Tex.Civ.App., 109 S.W.2d 992, in each of which a writ of error was dismissed by the Supreme Court, require an affirmance of the judgment in this case under the doctrine of stare decisis.

In the case first noted, all the issues of fact relied on by plaintiffs for a cancellation of their deed to the Limpia Royalties were decided adversely to them by the jury, except one, to wit, that plaintiffs relied on a certain representation alleged to have been made by Means and relied on by plaintiffs, as an inducement to execute the deed, and in the absence of such a finding by the jury, the presumption was indulged that the trial judge found adversely to plaintiffs on that issue.

The decision in the second case noted was based on the defense of the statute of limitation, without a discussion of the merits of other issues involved.

■ As shown in plaintiffs' petition, and in paragraph 8 of the declaration of trust, the plan of the trustees was to acquire mineral interests in many different portions of the country, and thus to increase the chances for profits for all shareholders, and to that end they provided for the large issue of 10,000,000 shares. The agreement of the trustees that they would with diligence proceed to carry out that plan was therefore a material consideration for the execution of the deed in controversy. And the procurement of the deed from J. S. Means and wife by the trustees, with no intention to carry out that agreement, was sufficient of itself to warrant a cancellation of the deed. 6 R.C.L. p. 927; 13 C.J. p. 615, § 668; 10 Tex.Jur. § 217, pp. 382 and 384. Nor was it necessary that the breach·be of the whole undertaking. Hausler v. Harding-Gill Co., 15 S.W.2d 548, by Commission of Appeals. To the same effect was the decision of the Commission of Appeals in Powers v. Sunylan Co., 25 S.W.2d. 808.

The statement in the opinion in Means v. Limpia Royalties, supra, that if the defendants had abandoned the enterprise, which was urged as an independent ground for relief, plaintiffs' remedy would have been for dissolution of the trust and distribution of its assets equitably among its shareholders, manifestly was upon the theory that plaintiffs were still shareholders. But if plaintiffs in this case establish their right of rescission, then J. S. Means and wife were never shareholders, and therefore that holding could have no proper application here.

Furthermore, it is expressly stipulated in the third paragraph of the declaration of trust, copied above, that the ownership of a certificate of stock "shall not entitle the owner thereof as such, to have or claim title to or in any of the property of the Trust, or the right to call for a partition

or division of such property; or a termination or dissolution of the Trust or for an accounting."

In this connection, it is to be noted that J. S. Means and wife, and the trustees, were the only parties to the contract of purchase, since title to be acquired was to be vested in the trustees and not in the shareholders, who had no voice in the transaction, either as to whether the purchase should be made at all, or as to the consideration to be paid therefor. "Limpia Royalties," the grantee in the deed in controversy, was the trade-name in which all transactions were conducted, and therefore it had no other legal significance.

It is well settled that the parol evidence rule does not forbid the introduction of parol evidence to show that the execution of a written instrument was induced by fraudulent misrepresentations or through mutual mistake of the parties. 17 Tex.Jur. § 378, p. 833, and § 379, p. 836.

For the reasons noted, the judgment of the trial court is reversed, and the cause remanded for further proceedings not inconsistent with the conclusions here announced.