## MOORE v. CITY OF BEAUMONT.

### No. 4325.

Court of Civil Appeals of Texas. Beaumont.
April 18, 1946.

Rehearing Denied June 20, 1946.

972

George M. Sonfield, of Beaumont, for appellant.

W. A. Tatum, City Atty., and J. B. Morris, both of Beaumont, for appellee.

WALKER, Justice.

R. A. Moore brought this action against the City of Beaumont to recover $13,772 which he had paid to the City for a conveyance by the City to him of a mineral royalty in and under the City's airport. He also prayed for cancellation of various instruments of conveyance. The trial court sustained exceptions to his petition and dismissed the action, and from this judgment he has appealed.

It is necessary to summarize Moore's allegations and we do so, as follows: The City of Beaumont is a municipal corporation, operating under a charter adopted pursuant to the Home Rule Amendment to the Constitution of this state. Vernon's Ann.St.Const. art. 11, § 5. On July 26, 1929, Evelyn R. Poole, et al. conveyed to the City by general warranty deed a tract of land in the A. Savery league in Jefferson County, containing 275.44 acres. This instrument purported to convey fee title and contained nothing indicating the use for which the land was intended. Actually, the land was bought and paid for with proceeds of bonds which had been voted and issued by the City for the purpose of acquiring an airport. Production of oil and gas from lands near this tract, and drilling operations conducted on adjacent lands during 1935 indicated that valuable deposits of minerals lay within this tract, and Moore agreed to purchase a ⅛₆th mineral royalty in and under the land and to pay therefor the sum of $13,772 upon delivery of a general warranty deed from the City conveying said royalty to him. On October 17, 1935, the City tendered Moore a conveyance of this royalty, but he required that authority therefor be procured from the city council, and on November 12, 1935, the council by resolution formally authorized this conveyance. On the day following, to-wit, November 13, 1935, Moore paid the agreed consideration of $13,772 to the City, and the City delivered said deed to Moore. The City's later deed, of January 14, 1935, hereinafter quoted, duplicates this instrument, with immaterial additions.

Moore alleges that the City appropriated this money and used it "for municipal purposes."

After this transaction was completed, Moore entered into negotiations with one Gordon for the sale by him to Gordon of a part of his royalty, but Gordon raised the question, whether the conveyance to Moore should have been authorized by an ordinance instead of by the aforesaid resolution, and Moore thereupon informed the City of his intention to sell a part of the royalty to Gordon, and of this particular defect suggested by Gordon. The City agreed to obviate this objection by passing an appropriate ordinance and by thereafter executing and delivering another deed to Moore, and this agreement was performed. On January 7, 1936, the City enacted an ordinance which ratified the previous deed to Moore, acknowledged receipt of Moore's $13,772, and authorized the mayor, city manager and city clerk to execute and deliver to Moore another general warranty deed conveying the agreed royalty to him, and pursuant to this ordinance the aforesaid officers did make, execute and deliver to Moore the general warranty deed dated January 14, 1936, which is quoted below. Since this instrument is a duplication of the deed to Moore of October 17, 1935, with certain immaterial additions, it may properly be set out as the complete expression of Moore's agreement with the City. It follows:

"The State of Texas

"County of Jefferson

"Know all men by these presents: That the City of Beaumont, acting herein by and through its Mayor, City Manager, and City Clerk, hereunto duly authorized, of the County of Jefferson, State of Texas, for and in consideration of the sum of Thirteen Thousand Seven Hundred and Seventy-two and no/100 Dollars ($13,772.00) cash to it in hand paid by R. A. Moore, the receipt of which is hereby acknowledged, has granted, sold and conveyed, and

by these presents does grant, sell and convey unto the said R. A. Moore, of the County of Orange, State of Texas, a one-sixteenth (⅟16) perpetual royalty in and to all the oil, gas, sulphur, coal, and other minerals upon and under or that may be produced and saved from the following described tract of land, to-wit:

"275.44 acres of land out of the Ashel Savery League in Jefferson County, Texas, known as the City of Beaumont Airport Tract, bounded on the West by the Ben Irby heirs' 157-acre tract, on the North by the B. S. L. & W. Railway right-of-way; on the East by the Gulf Terrace Subdivision; and on the South by the T. & N. O. Railway right-of-way.

"Delivery of such royalty to be made (less the proportionate part thereof used for fuel or other operative purposes on the premises) at the mouth of the mine or at any pipe line with which the well or wells may be connected, or in tanks, at the well, to be provided by grantee.

"It is understood that the provision herein for delivering or payment of such royalty to the said R. A. Moore, his heirs or assigns, shall be and constitute a covenant running with the land and binding upon grantor, his heirs or assigns, and if and when such oil, gas, or minerals are produced, such royalty shall be delivered or paid to the said R. A. Moore, his heirs or assigns, but it is expressly understood that nothing herein shall be construed as obligating grantor, its successors or assigns, to drill or otherwise operate for such oil, gas, or other minerals, against its will.

"And the City of Beaumont does bind itself, its successors and assigns, to warrant and forever defend all and singular said royalty interest to the said R. A. Moore, his heirs and, assigns, forever, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

"It is understood, however, that the above described lands are now under an oil and gas lease originally executed in favor of Joseph P. Landry, and now held by the Humble Oil & Refining Company, and this sale is made subject to said lease, but covers and includes one-half of all the oil royalty and other minerals royalty due to be paid under the terms of said lease, insofar as it covers the above described property, but that none of the money rentals which may be paid to extend the terms within which a well may be begun under the terms of said lease is to be paid to the said R. A. Moore. It is further understood and agreed that the Grantee does not by this conveyance acquire any right to participate in the making of future oil and gas mining leases on the land described herein, nor participate in the making of any future lease should the existing or future lease for any reason become cancelled or forfeited, nor participate in any bonus or bonuses which the Grantor herein shall receive for any lease, nor participate in any rentals, to be paid for the privilege of deferring the commencement of a well or wells under any future lease that may be hereafter executed.

"Nevertheless, it is further understood and agreed that this conveyance is a conveyance of a one-sixteenth (⅟16) perpetual royalty in and to all the oil, gas, sulphur, coal and other minerals that may be produced and saved from the said 275.44 acres of land described above.

"It is further provided that this is a conveyance of the identical one-sixteenth (⅟16) royalty mentioned and described in the royalty deed from the City of Beaumont to R. A. Moore dated October 17th, 1935, and recorded in Volume 407, page 393, of the Deed Records of Jefferson County, Texas, and this deed is made for the purpose of correcting said deed, and is not an additional royalty.

"In testimony whereof, the City of Beaumont has caused this instrument to be executed by its Mayor, City Manager, and City Clerk, and its seal to be affixed thereto, this, the 14th day of January, A. D. 1936.

"The City of Beaumont
"By (P. D. Renfro)
"Mayor
"By (G. H. Petkovsek)
"City Manager
"Attest (Seal)
"(Raymond Edmonds)
"City Clerk."

Gordon thereafter agreed to buy a part of this royalty, subject to approval of Moore's title, but eventually refused to accept a conveyance from Moore "for the reason that, in his opinion, the defendant City of Beaumont had no authority to convey the minerals under said tract of land to plaintiff and that its deed passed no title whatever because said property' had been purchased with the proceeds of a bond issue voted for airport purposes." Moore did not acquiesce in Gordon's action; and on or about September 6, 1936, brought suit against Gordon in the district court of Orange County for specific performance of the latter's contract of purchase. Gordon defended the suit on the ground whereon he based his refusal to accept conveyance of title from Moore, and this defense was sustained and Moore was denied relief against Gordon by a judgment of said district court dated February 26, 1937. The Court of Civil Appeals, that is, this court, 122 S.W.2d 239, on an appeal by Moore affirmed the judgment of the trial court by a judgment dated October 27, 1938, and on January 25, 1939, the Supreme Court dismissed Moore's application for a writ of error. Moore's motion for rehearing in the Supreme Court was overruled on February 15, 1939. Subsequently, to-wit: on or about March 21, 1939, Moore demanded of the City in writing that the money paid by him to the City, namely, the $13,772, with interest, be refunded to him; but the City refused and still refuses to pay him any part of this sum. He filed his original petition in this action on September 29, 1939.

This will do for a general summary of the facts alleged; but Moore has undertaken to plead various representations on the part of the City, made to him during his original negotiations with the city, and afterward; and these matters must be stated in more detail.

Moore alleged, in substance, that in his suit against Gordon, the trial court, and this Court of Civil Appeals, held that the City's conveyance to him was ultra vires because such a conveyance was inconsistent with use of the land for an airport, to which it had, in effect, been dedicated by the funds with which it had been purchased. As stated, these funds were the proceeds of bonds voted and issued by the city for the purpose of acquiring an airport.

Moore says that the City misrepresented its authority in these respects. He does not charge the City with deliberate fraud but his petition alleges statements by the City, on which he relied, respecting its authority to make the conveyance to him, and a subsequent course of conduct by the City and himself down to the time he demanded the return of his money, which show when taken with all the facts pleaded that he and the City acted under a mutual mistake, not only regarding the City's powers to convey the royalty which the City's deeds purport to convey, but also regarding the existence and nature of the property interest available for conveyance. The extent and effect of this mistake will be considered later but the city's representations and course of conduct must be referred to now.

Perhaps by way of giving point to the City's misrepresentations, Moore alleged that the City had power to acquire and own lands and to sell and convey the same, but alleged further that lands owned by the City were held in different capacities, to-wit, as trustee for the public, or privately, for use by the City as a corporation, and that at all times in question herein, the City did own and hold lands in each capacity; that the City's power to sell and convey lands held in trust for the public was subject to limitations (which were not specified); but that the City had the same power to sell and convey lands held by it privately as had an individual or a private corporation. The City's power to contract, to acquire property and to sell and convey the same was founded upon Section 5 of its charter, which Moore alleged as follows:

"Section 5. General Powers. (1) The City of Beaumont shall have perpetual succession; right of local self government; may use a corporate seal; may sue and be sued in all courts of law and equity having jurisdiction; may contract and be contracted with, implead and be impleaded in all such courts, and in all matters whatsoever; may acquire property in fee simple or lesser interest or estate by purchase, gift, devise, appropriation, lease or lease with the privilege to purchase for any municipal purpose; may sell, lease, hold, man-

age and control such real, personal or mixed property and make any and all rules and regulations by ordinances or resolution which may be required to carry out fully all the provisions of any conveyance, deed or will in relation to any gift or bequest or provision of any lease by which it may acquire property; perform and render all public services, and when deemed expedient, may condemn property for public use, within or without the city and may hold, manage and control the same; such condemnation proceedings to be governed and controlled by the law in force in reference to the condemnation of the right of way of railroad companies and the assessment of damages therefor; and shall be subject to all the duties and obligations now pertaining to or incumbent upon said city, as a corporation, not in conflict with the provisions of this charter, and shall enjoy all the rights, immunities, powers, privileges and franchises now possessed and enjoyed by said city and herein granted and conferred."

Moore said that the deed from Evelyn R. Poole et al. to the City, conveying the airport tract, did not show what the land was to be used for; it purported to convey title in fee simple, and when Moore and the City were negotiating for the purchase and sale of the royalty the City represented to Moore that "the defendant was seized and possessed of the fee simple title to said tract of land free of all encumbrances, that there existed no legal impediment preventing the sale of (the) minerals, and that defendant was ready, able and willing to execute a conveyance of same with a collateral contract of warranty." Moore alleged further that "relying upon such representations (he) agreed to purchase a (1/16) perpetual royalty in and to all the oil, gas, sulphur, coal and other minerals—and agreed to pay therefor—($13,772) in cash upon proper execution and delivery of a general warranty deed."

These allegations must be construed with Moore's deeds. Texas Rules of Civil Procedure, Rule 59; Southwest Stone Co. v. Railroad Commission, Tex.Civ.App., 173 S.W.2d 325. Moore plead these conveyances by exhibit; he refers to them and in effect construes them and says that thereby the City purported to convey to him the royalty he undertook to purchase. Yet if these instruments be given a technical construction, they might seem inconsistent with the allegations just referred to; because it appears from the face of said deeds that Moore and the City were dealing with a tract of land supposedly under lease. Such deeds would not have conveyed a "perpetual royalty" in a strictly legal sense if the lease had been valid; instead Moore would have acquired an interest in the lease royalty and an interest in the City's possibility of reverter which would have vested him automatically with title to a 1/16th nonparticipating fee royalty on the termination of said lease. However, Moore obviously did not intend to contradict himself; and we may properly treat his allegations respecting the city's representations to him as being consistent with the existence of the lease and as having been directed toward the power of the city to convey the royalty interest purportedly conveyed on the face of his deeds. Certainly, it was Moore's intention to say that he purported to buy and the city purported to convey to him a royalty not burdened with rights in the public to have the land used for an airport.

Moore alleges that representations similar to those quoted above were made to him by the City when he informed the City of Gordon's first objection to his title, and we note an allegation that on this occasion the City represented to him "That said tract of land was held by Defendant in its private or proprietary capacity." Furthermore, he says that when Gordon finally rejected his title the City was informed thereof, and of the reason advanced by Gordon for his action, and the city "assured plaintiff that said conveyance and said collateral contract of warranty was in all respects legal." Moore indicates that similar expressions were made to him by the City at later times, but does not show when these statements were made. His petition alleges that he chose not to make the City a party to his suit against Gordon, apparently because the City did not want to become a party to the suit and "such course was not calculated to produce beneficial results." The City was informed of his suit against Gordon, and the city clerk testified on the trial of that

case. It seems to have been Moore's intention to allege generally that the City consistently treated and held out its conveyance as being valid, and he alleges that when he presented his demand to the City for the return of the money paid by him as consideration for the royalty, and the City refused his demand, that then and there, for the first time, the City took the position that the royalty transaction was ultra vires and that his right to recover the $13,772 was barred by limitation, and that the City would stand on these propositions in rejecting his demand.

We shall now refer briefly to various legal theories of the parties which are exhibited by the pleadings.

Moore's petition states very fully several legal conclusions as to what his rights against the City are. He treats his deeds as void, and this court's judgment in Moore v. Gordon as holding them to be void. He claims a right of recovery under a covenant of general warranty, and covenants to be implied under Article 1297, R.S.1925. He claims a total failure of consideration for his $13,772, and pleads a constructive trust in his favor of that money. He also purports to allege a cause of action for money had and received.

■ These arguendo allegations have of course been considered, but the matter which has controlled our determination of the parties' rights is Moore's allegations of the facts, for this court must determine Moore's rights as such facts show those rights to be, and grant relief accordingly.

Moore's prayer will support any recovery to which he may be entitled under the facts he alleges. He has not, in so many words, alleged a mistake as a ground of relief, but his fact pleading shows the existence of a mistake, and we note that he has prayed for relief on that basis, as follows: "Plaintiff further prays in the alternative that by reason of the fraud of the defendant hereinabove set out, and because of the mutual mistake of the parties hereto with respect to the title of the defendant to said land, plaintiff, in any event should recover judgment of and from defendant, rescinding, cancelling and vacating all of said instruments involved herein, and for recovery of the purchase price of said royalty with interest, and for such other and further relief, both general and special, in law and in equity, to which he may prove himself entitled."

■ Moore has carried the effect of the "mutual mistake respecting the title of the defendant" a good deal farther than it actually goes, but all his pleading need do— if he need go beyond his prayer for general relief—is to show the mistake; it is the court's function to determine the effect of the mistake and especially so here, where the mistake is largely one of law.

The City raised the following defenses to Moore's action by exceptions to Moore's petition:

(1) The conveyance to Moore was ultra vires, and therefore void because the land had been dedicated to use as an airport and said conveyance was inconsistent with this use.

(2) The City's power to warrant title, and to warrant the right to convey title, depends upon, is limited by, and does not run beyond its power to convey title; and as the City did not have power to convey the royalty to Moore, it did not have the power to make the warranties alleged by Moore, and said warranties are therefore unenforceable in this action.

(3) The foregoing matters were evidently pleaded in bar of Moore's recovery on an express contract by the city. In bar of any other recovery, that is, any implied obligation to refund the $13,772, the City raised the two year statute of limitations.

### Opinion.

The exceptions to Moore's petition substantially raise the question, whether Moore alleged a cause of action against the City, and if he did, whether that cause of action was barred by the two years statute of limitations. Our judgment necessarily depends upon an assumption that Moore's allegations are true.

■ I. We will first state our opinion regarding the effect of the City's conveyance to Moore. We hold that this conveyance was not absolutely void; the City's deeds vested Moore with title to a royalty interest in the airport, although not the in-

terest with which he and the City purported to deal. We hold further that the judgment of this court in Moore v. Gordon, 122 S.W.2d 239, did not determine the issues now before us; those issues were not raised in that proceeding. The fundamental question presented in Moore v. Gordon was whether Moore had good and merchantable title to the interest which Gordon bought. The court rightly held that he did not; Gordon purchased a royalty free of encumbrances and he was tendered a royalty burdened with a servitude which made his enjoyment of the royalty depend upon a contingency, namely, abandonment of the airport by the City. Statements of principle were made in the opinion handed down in Moore v. Gordon which, unless referred to issues then before the court, might support a holding that Moore's deeds were absolutely void; but we do not agree that the relevant principles of law should be carried that far. It may be that our opinion concerning the rights of the parties to this appeal involves a limiting of statements made in Moore v. Gordon; and we shall therefore express our views in full detail regarding the rules of decision on which our judgment depends.

Our conclusion respecting the effect of the City's deeds to Moore is based upon the following reasoning:

■ (1) The City had power to acquire fee simple title to land under Section 5 of its charter and the relevant provisions of Article 1175, R.S.1925. See City of Stamford v. King, Tex.Civ.App., 144 S.W.2d 1923, at page 926. This power, indeed, seems implicit in the statutes which authorized the City to establish an airport. Therefore, the deed to the City from Evelyn R. Poole, et al. actually vested fee simple title in the City to the airport tract, as it purported to do.

■ (2) The City acquired the land from Evelyn R. Poole, et al. for the purpose of establishing an airport thereon. Moore alleges, in effect, that this land was paid for with proceeds of bonds which had been voted and issued for the purpose of acquiring an airport. Therefore, during such a period of time as the city council of the city of Beaumont deemed it proper to use this land for an airport, the land was, in a sense, dedicated to that purpose to this extent, namely, that until the city council lawfully determined to abandon the land for use as an airport, the City could not use the land for any other purpose which, as a matter of fact, would interfere with use of the land for an airport. City of Beaumont v. Matthew Cartwright Land & Improvement Co., Tex.Civ.App., 224 S.W. 589; Moore v. Gordon, Tex.Civ.App., 122 S.W.2d 239. However, it is recognized in both decisions that the City need not always use the land for the purpose for which it was originally acquired; it is held in each that the particular use can be abandoned. We hold further that the exercise of the City's power to abandon a use of land is not limited to the tract as a whole; the City must be allowed to exercise this power in a practical way, according to the circumstances which may arise; and if the City discovers that all of the land is not needed for the purpose for which the land was acquired, then the City need not continue to use all of the land for that purpose. That part of the land which is not needed can be sold; it was so held in Sayles v. City of Abilene, Tex.Civ. App., 290 S.W. 239, affirmed Tex.Com.App., 295 S.W. 578.

At this point we think it proper to interpolate certain comments regarding the decisions in Beaumont v. Matthew Cartwright Land & Improv. Co. and Moore v. Gordon. Moore applied for a writ of error in his case, and in his application attacked the statements in the Beaumont case and in his case limiting the use to which the City may put land bought with bond proceeds. We have fully considered both decisions and agree with the determination made therein of fundamental principle; we do not agree, however, that this principle ought to be applied as rigorously as Moore v. Gordon may indicate. Briefly, we think that land purchased with bond funds is necessarily devoted to the purpose for which the bonds were voted (at least so far as to prohibit any use which is inconsistent in fact with use of the land for the bond purpose) because a diversion of the land to a different purpose amounts to a diversion of the bond proceeds. Moore

v. Gordon held that using the land to produce minerals from deposits within the land diverts the land from the bond purpose where production is inconsistent with use for the bond purpose (as if the city had constructed a water works on land purchased with airport bonds) ; and this must be so where it occurs before the city determines to abandon the leased land, although the lease is only a conveyance and production thereunder is only the lessee's taking possession of his property, for otherwise the City could interrupt use for the bond purpose in order to produce minerals and make money. In effect, the City could go into the oil business on money voted to acquire an airport. However, voting the bonds did not require the City to operate an airport for all time to come, regardless of future circumstances; the City had potential power to cease operating the airport, to move the airport, and doubtless to suspend airport operation temporarily. How, then, may the exercise of these undoubted powers be adjusted to the undoubted necessity of abiding by the bond purpose in using the land? We think the adjustment is to be made by keeping in mind that the land represents the proceeds of bonds voted for a definite purpose and may not be devoted to another purpose, that the aforesaid powers exist and ought to be exercised in behalf of the public, and that what the public benefit requires from the exercise of these powers is not to be determined, at least primarily, by the fact that the city can substantially increase its income by the proceeds of a mineral royalty from the land. Our judgment in this case is founded upon what we think a logical application of these principles to the record before us.

■ To return to the course of our argument: The power to abandon the use of the land for the purpose for which it was acquired, or to determine that all of the land need not be devoted to this use and that the unnecessary part shall be sold, necessarily involves the exercise of a discretion; and as stated, this discretion must be exercised in the public behalf, when the public benefit requires. Therefore, any agreement by the City which as a matter of fact, although not necessarily in express language, will deprive the City of the ability to exercise this discretion when the public benefit suggests is ultra vires and absolutely void. As said in Waterbury v. City of Laredo, 68 Tex. 565, 5 S.W. 81, at page 84, regarding a contract which restricted the City's power to regulate charges made for passage on its ferries; "Such a contract, if valid, certainly would divest the municipal government of the discretion conferred upon it—a discretion necessarily legislative in character, which such a body can not surrender by contract, or bind itself not to exercise freely whenever it may become necessary. So much of the contract seems to us clearly invalid." And to the same effect, see: Texas Water & Gas Co. v. City of Cleburne, 1 Tex.Civ.App. 580, 21 S.W. 393, at page 396; Sayles v. City of Abilene, Tex.Civ.App., 290 S.W. 239, at page 243 (affirmed Tex.Com.App., 295 S.W. 578) ; City of Teague v. Sheffield, Tex.Civ.App., 26 S.W.2d 417 at page 420; City of Brenham v. Brenham Water Co., 67 Tex. 542, 4 S.W. 143 at pages 148-149 and at page 150.

■ The exercise of the aforesaid power to abandon can be expressed in any way which shows that the City attempted to exercise the power. An unconditional conveyance shows such an attempt because the City necessarily must abandon its use. However, an ordinary oil and gas lease does not; the lessor retains a right to use the surface except as modified by necessities of the lease and such a lease, considered alone, represents only an agreement to abandon.

■ The foregoing principles apply to the City's lands generally, including fee lands which acquire a mineral value. The City, however, has a power to lease its mineral lands which affects the application of these principles, and which is itself affected and somewhat limited by the application of said principles. The City's power to lease is expressed in Article 1267, R.S. 1925, in the following language: "Cities and towns chartered or organized under the general laws of Texas, or by special Act or charter, which may own oil or mineral lands, shall have the power and right to lease such oil or mineral lands for the

benefit of such town or city, but shall not lease for such purposes any street or alley or public square in said town or city, or any land therein dedicated by any person to public uses in such town or city; and no well shall be drilled within the thickly settled portion of any city or town, nor within two hundred feet of any private residence." Construed literally, this statute specifies a power to lease which may be exercised whenever the city desires. We hold, however, that this is a subordinate power, at least regarding lands acquired with proceeds of bonds voted for a certain purpose (and the case before us goes no further); that the legislature did not intend by this statute to vest in the city a power to make agreements which would prevent the City's exercising, in the public behalf and when the public interest requires, the discretion to continue or to abandon the use of such land for the purpose for which it was acquired; and that the power to lease can not be exercised until the City has lawfully determined to abandon the aforesaid use, or such part of the land as may not be necessary for that use, and then only regarding the acreage which is to be abandoned. It is realized that this construction of Article 1267 affects the City's power to lease its mineral lands; and that it may seriously limit the City's ability to exercise this power in the practical way available to private individuals. However, Article 1267 was not enacted to give the City a chance of catching bargains or to make money. We believe, instead, that the Legislature intended thereby that the City should have only a power to protect itself against loss from lands which the public benefit did not require the City to put to a use inconsistent with mineral development.

Authority to acquire an airport was granted the City by Chapter 83, Acts of the First Called Session of the 41st Legislature, which, as amended by Chapters 51, 142 and 609 of the Acts of the 47th Legislature, now appears as Article 1269h, Vernon's Tex.Civ.Stats. There is nothing in any of these various acts which would affect the City's power to abandon the use of the particular land for an airport.

■ (3) We hold that the City had the abstract power to convey a royalty, at least in fee lands which Article 1267 did not forbid the City to lease for mineral development; and that this power was not contingent upon the existence of a valid mineral lease covering said land.

The existence of this power results from the following matters: (a) Fee simple ownership by the City; (b) general power to convey its lands, which is vested in the City under Section 5 of its charter, quoted above: (c) Article 1267, R.S.1925, with which the general power to convey should be construed; when said general power is so construed, it authorizes a conveyance of a mineral interest in a tract of land; and (d) the City's power to determine that all of the land is not necessary for the purposes for which it was acquired and to sell that part of said land not needed for that purpose.

We say that when the general power to convey, expressed in Section 5 of the charter is construed with Article 1267, expressing a power to lease mineral lands, it authorizes the City to convey a mineral interest in a tract of land. The power to lease is but a phase of the power to convey. Avis v. First National Bank of Wichita Falls, 141 Tex. 489, 174 S.W.2d 255. It is, in effect, a power to convey a part of the minerals or an interest in the minerals, and also certain surface rights incidental thereto; and under a valid oil and gas lease the City will be vested with the surface estate and with the royalty and possibility of reverter interests ordinarily remaining to the lessor under such a lease. Certainly the City's general power to convey authorizes the City to convey this surface estate and these royalty and reverter interests at one and the same time, to one and the same person. This being true, the city can make at least two valid conveyances, each for less than all of the land, one to the lessee which covers the working interest in the minerals and one to the vendee which covers all that is left to the city of the land. If the general power to convey goes this far, there is no reason why it should be restricted to these two instances, and it must in reason go far enough to authorize a conveyance of, say, the reverter interest to one person and the royalty under the lease to another. Ac-

cordingly, since the power to make the last mentioned conveyances is derived from the general power to convey, and since that general power has not been expressly made contingent upon an existing lease, we think that power is broad enough to authorize a royalty conveyance before a lease is executed.

The City's power to abandon use of land not needed for the purpose for which the land was acquired would support the City's sale and conveyance of a royalty; in land purchased with proceeds of bonds; and the city's deed would be expression enough of the city's intention to exercise that power. Ownership of the royalty by the City's vendee would have to be consistent with the City's continued use of the land for the purpose for which the land was acquired; but there is no reason why it should be inconsistent with that use. The nature of a royalty interest in minerals is well enough shown by Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543, and Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43. A royalty owner has no power to lease or use the surface, or to interfere with the land owner in any way. It might be, or it might not be true that the courts would raise an implied obligation in his favor, requiring the land owner to lease the land under certain circumstances; but such an obligation could not be raised against the city while the city is using the land for the bond purpose for thereby an agreement would be attached to the royalty to abandon the particular use of the land and this would be invalid because it necessarily involves a restriction on the City's legislative powers. The same reasons invalidating an oil and gas lease, as hereinafter shown, would invalidate this implied agreement. Thus the vendee would take title to the royalty subject to a contingency that the city might, or might not abandon its use of the land. His purchase would thus be speculative, but the facts might justify a speculation. If the facts known to the vendee suggested that an oil field would develop adjacent to the airport involved in this appeal, he might reasonably conclude that flight of airplanes into and out of the airport would become dangerous and that the city would have to move the airport. There might be other reasons justifying him in believing that the airport would be moved. Doubtless his speculation would affect the price the vendee would pay and thus, the City's willingness to sell; but if the vendee wants to pay a price and take a royalty burdened with the contingency that the city might or might not abandon the particular use of the land, we see no reason why he should be denied the privilege of so doing. The entire matter respecting the sale of such royalty seems to be one which can be, and properly ought to be left to the lawful exercise of the city council's discretion.

(4) However, the principles heretofore stated requiring the city to keep in mind the bond purpose in using the land, and forbidding agreements by the city council limiting their discretion to act in the public behalf, requires us to hold that an oil and gas lease covering *all* of the land acquired with proceeds of bonds is invalid if production of oil and gas will be inconsistent as a matter of fact with continued use of the land for the purpose for which it was acquired, and if said lease is not accompanied by a lawful determination, then and there existing, to abandon said use.

There is no room in such a case to apply the City's power to abandon use of unnecessary *parts* of the land, and the lease can not be supported by that power.

Unless the lease is accompanied by a present determination to abandon a particular use of the land, it represents in fact an agreement to permit the entry of the lessee when the lessee requires, and thus deprives the council of their power to abide by the bond purpose in using the land and of their legislative discretion, to be exercised in the public behalf, to continue or abandon that use, in cases where that use is inconsistent with mineral development. This is certainly true under an ordinary lease, where the lessee has the privilege of entering when he wishes so to do. The lease may not be in the ordinary form; the lessee may agree not to enter until some event occurs, but unless the only event specified is the will

and pleasure of the city council, such a lease as much deprives the council of their discretion as does an ordinary lease. If we are to hold that the city council can not make agreements which will prevent the exercise of their discretion to determine whether a use shall be abandoned, and we do so hold, then we must necessarily hold that the above mentioned leases are invalid; because said leases amount to nothing less than the prohibited agreement—that is, provided the lessee's operations will be inconsistent with the city's use as a matter of fact.

An oil and gas lease covering an entire airport presupposes operations which will be inconsistent with continued operation of the airport.

 When these rules are applied to the record before us the city's lease to Joseph P. Landry is at least presumptively void. In the first place, that lease covered the entire airport; Moore's deeds recite that "The above described lands are now under an oil and gas lease originally executed in favor of Joseph P. Landry, and now held by the Humble Oil & Refining Company." In the second place, Moore's failure to plead this lease more fully than he has done has not been excepted to by the city, and we must therefore assume that the lease referred to in Moore's deeds is an ordinary oil and gas lease. In the third place, there is no showing in Moore's petition that the lease to Landry was accompanied by a determination to abandon the airport; rather, the effect of that pleading is to the contrary. The City, as is pointed out immediately below, has •pleaded the Landry lease in full, and the instrument alleged by the City shows affirmatively that the city had not determined to abandon the airport, and it purports, as well, to cover the entire airport.

This conclusion finds respecting the validity of the lease support in Moore v. Gordon, Tex.Civ.App., 122 S.W.2d 239.

The City has pleaded the Landry lease in full; and it may be that we should consider defendant's pleading in determining the effect of the exceptions to Moore's petition. 33 Tex.Jur. 593, Section 150. At any rate, we have thought it proper to no-

tice the City's pleading to the extent hereinafter shown, having in mind the necessity of further proceedings in the trial court. The lease alleged by the City contains some unusual provisions, but nothing which would change the conclusion reached on Moore's pleading. It requires abandonment to the lessee of whatever part of the airport may be productive. It is substantially an ordinary "unless lease" for a primary term of approximately five years, except as modified by the following provisions:

"The Grantee shall not drill for oil or proceed with the operations hereunder on the above land unless and until a well is brought in within three hundred (300) feet of a line of this land which shall produce as much as two hundred (200) barrels of pipe line oil per day for thirty (30) consecutive days, thereby indicating possible production on the herein leased land.

"Upon completion of a well within three hundred (300) feet of this land, as above mentioned, Grantee shall, with reasonable promptness, begin, and with reasonable diligence, prosecute in a good workmanlike manner the drilling of a well for oil on the land herein granted in an honest effort to discover oil or other of such minerals in paying quantities, which well shall be an offset well to the discovery well on such other land, and shall be drilled within three hundred (300) feet of the boundary line of the land herein granted.

"Prior to the discovery of oil, gas, sulphur or other minerals in paying quantities on the land herein granted, the Grantee shall not construct any light lines, telephone lines, pipe lines or other services of any kind whatsoever without written consent from the Grantor herein first had and obtained.

"In the event oil, gas, sulphur or other minerals are produced hereunder in paying quantities, in that event, Grantor agrees when so requested by Grantee to remove all of its property from that portion of the herein leased land which has proven to be productive thereof within six (6) months from the date of such request, which request shall be in writing and delivered to Grantor."

These provisions represent a sensible and practical adjustment of the City's use to an adequate development of the minerals, and might be valid if we could hold as a matter of law that on discovery of valuable mineral deposits within the land, the City could then and there, for that reason alone, devote the land to mineral development; but we can not make that holding. The necessity of abiding by the purpose for which the bonds were voted, the land having been paid for with the proceeds of said bonds, might very well require continued use of the land for the purpose to which it had been devoted. The facts, of course, might tend the other way; but unless the council's discretion is free, the council has lost its power to consider the facts and to act in accordance therewith as the bond purpose and the true public interest requires. Perhaps these matters depend on how Article 1267 should be construed. As heretofore stated, it is our opinion that the power to lease which is expressed in this statute was granted, not to give the city a chance of catching bargains or to make money, but to protect the city against loss from land which the public benefit did not require the council to devote to another use.

We do not propose to render final judgment on the Landry lease; that question is not before us and it is at least possible that facts exist dehors the record which may affect the validity of that lease. We do hold that on the face of Moore's petition, the Landry lease is presumptively void and that nothing appears on the face of the lease alleged by the city which shows said lease to be valid.

■ (5) With these principles in mind, it may now be determined what interest, if any, Moore acquired under his deeds from the city.

Moore's second and final deed from the City is quoted above; it duplicates his first deed except in immaterial respects.

Under the granting clause of these instruments, the City purports to convey to Moore a 1/16th fee royalty in and under the land, and to warrant title thereto. It is provided that "nothing herein shall be construed as obligating grantor, its succes-sors or assigns, to drill or otherwise operate for such oil, gas or other minerals against its will." Reference is made to the Landry lease; the conveyance is declared to be subject to that lease, but one-half of the royalty payable under that lease is conveyed to Moore, and provisions follow which are commonly found in such instruments, confirming the City's exclusive right to lease the land for production of minerals, the City's exclusive right to bonuses and rentals under such future leases, and the City's right to all rentals payable under the Landry lease.

These provisions show an assumption that the Landry lease was valid, and a transaction based on that assumption. Had the Landry lease been valid, the City would have owned the royalty reserved therein, the possibility of reverter thereunder, and the surface estate in the land burdened with the lease; and Moore's deeds would have conveyed to Moore a part of the lease royalty and an interest in the reverter which would have automatically vested him with title to a 1/16th nonparticipating free royalty on termination of the lease. It was therefore at least the surface intention of the parties to deal with precisely those interests. Certainly these deeds tend to show, as Moore in effect alleged, that Moore bought and that the City attempted to convey to him a royalty which was free of any rights of the public or any duty to the public by the city council.

It is evident that the parties completely mistook the city's power under the law, the effect of the conveyance, and the property interest which was available for conveyance. The conclusion to be drawn from Moore's petition is that the Landry lease was absolutely void; the City therefore had no royalty or reverter interest thereunder to convey to Moore. Instead, the City retained a fee title to the land, with only a power to convey a royalty burdened with the City's right to continue to use the land for an airport until a lawful determination was made to abandon that use.

Exactly that interest was conveyed to Moore by the City's deeds. This interest fell within the scope of the primary granting clause of those instruments reading as follows: " * * * granted, sold and con-

veyed, and by these presents does grant, sell and convey unto the said R. A. Moore * * * a 1/16th perpetual royalty in and to all the oil, gas sulphur, coal, and other minerals upon and under or that may be produced from the land. * * *." It was accordingly conveyed thereby. See Article 1290, R.S.1925, which applies to the City as a grantor and to this royalty conveyance. The provisions in the City's deeds which refer to the Landry lease and purport to convey interests thereunder did not limit the operation of this clause as a conveyance.

The conveyance sufficiently evidences a determination to abandon that part of the land represented by the royalty interest and under Article 1290 the attempted exercise of the power may be carried as far as it could lawfully go.

■ II. Having determined the effect of Moore's deed, the point next to be determined is, what effect shall be given the warranties in those deeds. Moore has pleaded a covenant of general warranty by the City and also covenants to be implied under Article 1297, R.S.1925. We hold that these warranties are unenforceable against defects in title resulting from some lack of power by the City for the reason that such warranties, if they cover such defects, would then constitute agreements to protect the vendee against performance of duties imposed upon the city by law. Said warranties are analogous to the arbitration agreement held unenforceable in Industrial Co. v. Tompkins, Tex.Civ.App., 27 S.W.2d 343.

■ The City, of course, ordinarily has power to warrant title; that power was vested in the City of Beaumont under Section 5 of its charter. Abbott v. City of Galveston, 97 Tex. 474, 79 S.W. 1064. This is a phase of the power to contract. Doubtless a power to contract which would support the warranty of title would also ordinarily support the covenants implied under Article 1297, R.S.1925; but the City's authority to enter into those covenants depends upon its power to contract and not upon Article 1297. That statute confers no authority upon the city; it operates only where the City has a power, derived from another source, to make the agreements which are to be implied under its provisions.

■ The warranties alleged by Moore have the same meaning when used by the City as by a private person. The meaning of a general warranty is well enough shown by the following quotation from Hollingsworth v. Mexia, 14 Tex.Civ.App. 363, 37 S.W. 455, at page 458:

"The covenator in a warranty receives the price for which he has sold the land, and the true meaning of his covenant, as fixed by those decisions, which have established the general rule of damages, is that he will, in case the land is entirely lost, restore that price to the person who has lost the land. This rule, it is true, applies perfectly in only those cases where there is total eviction, and in cases of partial loss it has been modified so as to allow a recovery of only such proportion of the consideration as the amount of the loss bears to the whole of it. Again, the doctrines regulating the rights of principal and surety and the subject of subrogation have no application. The right of the person evicted to sue upon remote covenants is not derived from a subrogation to the rights of his vendor, nor is there anything like the relation of principal and surety. The covenant of warranty, until it has been broken, passes, as a strictly legal right, with the land, when that is conveyed. Rawle, Cov. pp. 334–336, 359. An intermediate owner of the land has no right of action upon the covenants under which he held until he has been made to respond to the claims of his covenantee. But the party evicted has the original right of action against all."

The only provision of Article 1297 which might apply to this appeal is subdivision 2 thereof, whereby a covenant is to be implied that the estate conveyed "is at the time of the execution of such conveyance free from incumbrances." This is a contract to indemnify against actual loss; it was defined in Woodward v. Hardin, 121 Tex. 46, 39 S.W.2d 8, at page 9 (rehearing denied 121 Tex. 46, 41 S.W.2d 204), in the following language: "The decisions of the Supreme Court of Texas

have been to the effect that our statutory covenant against incumbrances (Rev.St. 1925, art. 1297) implied from the use of the word 'grant' or 'convey,' being the covenant relied on to sustain a recovery in this case, was a covenant looking to the future and promising compensation for damages at such time as the same might be actually sustained."

Apply such agreements to the City's ultra vires conveyance and what they amount to are contracts by one city council that a later city council will indemnify a vendee against an act which they ought to do because the first city council, in dealing with the vendee, did not abide by the law. The present case illustrates this conclusion. On the face of his deeds, Moore is a beneficiary of the City's ultra vires lease to Landry. If the lessee were permitted to occupy the airport and disturb the public use, Moore would enjoy his royalty; but if the council repudiated the lease, as a recollection of the purpose of the bonds paying for the land and a recognition of the public weal might require, he would recover his money, with interest thereon. Moore's construction of the City's warranties convert said warranties into indemnity agreements protecting Moore against the use of the land to which it had, in some sense of the word, been dedicated and against performance by the City of the duty owed the public under that dedication. Such agreements have too direct and intimate a relation to the original ultra vires act to permit their being enforced; the warranties, in effect, are necessary and integral part of an ultra vires scheme and must themselves be declared ultra vires.

Moore says that the City's warranty of title is only a written expression of an obligation which the law would impose upon the City in any event. He says that he got nothing for his $13,772, and that the law places an obligation upon the City to repay him; and he says further that the general warranty is nothing but a promise by the City to perform this legal duty.

Moore actually got something for his $13,772, although not what he wanted; but this proposition may be denied because the warranty is not equivalent to any obligation which the law might impose on the City. The warranty differs from the legal obligation in nature and effect, and also in transferability. The quotation above from Hollingsworth v. Mexia shows that the covenant of general warranty is, in substance, a contract to indemnify against future loss, which under lawful conveyance of the land passes from vendee to vendee until actual eviction. The obligation of the City under the legal duty referred to above is not an indemnity contract, instead, it is substantially a duty to return to the payor money to which the payee never acquired title in equity. In Merryfield v. Willson, 14 Tex. 224, at page 225, 65 Am.Dec. 117, where the vendee sued the vendor to recover the purchase price of a land certificate which was nontransferable under the law, the court held that he could recover said money on the following principle: "The plaintiff could not enforce specific performance of the contract, it is very clear. But he was entitled to recover back the money he had advanced upon the contract upon the equitable principle on which the common law action for money had and received was maintained; that is, that where one person has received money of another which in honesty and good conscience he can not retain, an action will lie by the party entitled to recover it back; or, as it has been expressed in conformity with Lord Mansfield's view of the equitable nature of the action for money had and received, 'when money is due ex aequo et bono, it may be recovered in an action of assumpsit' for money had and received." The obligation on the part of the city to repay, if it existed, came into existence immediately when the City received the money, and said obligation required repayment by the City then and there. Gould v. City of Paris, 68 Tex. 511, 4 S.W. 650; City of Houston v. Finn, 139 Tex. 111, 161 S.W.2d 776. Immediate repayment was required even though the city or other payee had promised to repay at sometime in the future. Merryfield v. Willson, 14 Tex. 224, at page 225, 65 Am.Dec. 117; O'Connor v. Dew, Tex.Civ.App., 55 S.W. 2d 882. Continued performance by the city of agreements to pay, at least under ultra vires contracts of purchase, has ap-

parently not been given any effect; the two year statute has been rigorously applied. See: Texas Water & Gas Co. v. City of Cleburne, 1 Tex.Civ.App., 580, 21 S.W. 393; Ellis v. City of Cleburne, Tex. Civ.App., 35 S.W. 495; City of Wink v. R. B. George Machinery Co., Tex.Civ.App., 73 S.W.2d 653; Clay Bldg. Material Co. v. City of Wink, Tex.Civ.App., 141 S.W.2d 1040. Doubtless the City's obligation under the law could be transferred but not on any such basis as a covenant running with the land. We do not perceive any substantial identity between the City's warranty and the obligation which might be implied under the law to repay Moore's purchase price.

Moore says further that the City is estopped to deny the validity of these warranties because the City has not repaid his $13,772. This proposition is overruled. These warranties purport to be executory agreements. They must be supported by a consideration to be enforceable in any event, and the consideration for said warranties was the price paid by Moore. Thus Moore claims an estoppel because he has paid the consideration needed in the first instance to support any executory promise. This is not enough to estop the City. If it were, it is difficult to see how the City could even deny the validity of any bond, any contract of purchase, or any contract of any kind. Generally, this court is not authorized to require the City to comply with an executory agreement which the City has no power to make, and if we sustain Moore's point we do that very thing. It is ordinarily the duty of city officers to repudiate such ultra vires agreements, and it is always the business of one who deals with the city to ascertain what agreements city officers can, and can not make and be governed accordingly. The vendee may have, and in this case we hold that Moore does have enforceable rights against the city, but these rights depend upon principles of equity and not upon the City's contracts. See, regarding the matter of estoppel: City of Teague v. Sheffield, Tex.Civ.App., 26 S.W.2d 417, at page 420; City of Big Springs v. Ward, 140 Tex. 609, 169 S.W.2d 151.

III. We may now determine what rights Moore has against the City. We hold that on the record before us he had a right to rescind his agreement with the city and recover the consideration paid by him to the city; our conclusion is based upon the following grounds: (a) Moore did not get the royalty he contracted to buy and the City contracted to convey, and thereby sustained legal injury; (b) this situation resulted from a mutual mistake; (c) Moore's warranties are unenforceable; (d) while the city has expended his money said funds were spent for municipal purposes and it is therefore proper to require repayment by the city. These matters require further discussion.

First, regarding the matter of injury: Moore's deed was not absolutely void; he acquired title to a royalty but not the interest with which he and the city dealt. The royalty he got was burdened with a dedication which made enjoyment thereof contingent beyond the degree contracted for and subjected him to a speculation of such a nature as to make what he got different in quality and kind from what he bought. Moore's position is analogous to that of the vendees in Nance v. McClellan, 126 Tex. 580, 89 S.W.2d 774, 106 A.L.R. 117.

In Nance v. McClellan the vendees bought a town lot from the vendor for the special purpose, as the vendor knew, of erecting and operating a hotel thereon; and the vendor represented to them that a public street ran in front of the lot. This representation was false; the lot opened upon the railway company's right-of-way which the public commonly used as a street, and the other sides of the lot were bounded by privately owned property. Conveyance was made to the vendees. Thereafter they discovered the facts and then brought suit to recover that part of the price actually paid by them for the land, and also to cancel a note for the balance of the price, and a deed of trust securing said note. Judgment in their behalf as prayed for was affirmed. The principal question to be determined was whether the vendees had brought their case within any exception to the general rule, laid down in Russell v. Industrial Transportation Co.,

113 Tex. 441, 251 S.W. 1034, 258 S.W. 462, 51 A.L.R. 1, that proof of pecuniary loss or damages must be made in a suit to rescind a contract for fraud, and the court held that they had, saying: "The principle, stated generally, which supports and compels the exception or qualification, is that a purchaser of property, whether real or personal, is entitled to the benefit of his bargain, and should not be obliged to accept something that he did not buy." And regarding the purchase of land which the vendor fraudulently represents to be suitable for a particular use but which is not, the court said that the result to the vendee was the same as if he had been conveyed property differing in physical identity from that which he agreed to buy "for the buyer has received propery which is unfit for the particular purpose of its purchase and thus is as useless to him as it would have been had it been different in physical identity." Nance v. McClellan was a fraud case and there is no fraud here, but the mistake here has resulted in the same kind of injury to Moore as the vendor's misrepresentation caused the vendees in Nance v. McClellan.

■ Next, regarding the parties' mistake: Moore's petition at least raises the issue that his conveyances were the result of a mutual mistake of himself and the city. The mistake appears on the face of Moore's deeds and from Moore's allegations respecting the City's misrepresentations to him and his reliance thereon. It is held that innocent misrepresentations may evidence a mutual mistake and that allegations of misrepresentation may be treated as alleging a mutual mistake although fraud is specifically referred to. See Mason v. Peterson, Tex.Com.App., 250 S.W. 142, at page 146 (Sec. 6); Culbertson v. Blanchard, 79 Tex. 486, 15 S.W. 700. Of course, we have nothing but pleadings before us.

At the bottom of the transaction between Moore and the City was a mistake regarding the City's power to deal with the airport as the council willed. This mistake may be purely one of law. It caused another mistake, namely, a belief that the Landry lease existed and that the City owned royalty and reverter interests thereunder which could be conveyed to Moore. This is to some extent a mistake of fact. The City argues that Moore's petition shows he knew of the relevant facts at all relevant times; and this suggests that the mistake of Moore and the City was a mistake of law all through their transaction. Since we have concluded that we may grant relief to Moore by way of rescission even if Moore did know all of the facts at all relevant times, it may be assumed that the City had rightly construed Moore's petition.

■ We hold that Moore is entitled to equitable relief from his contract with the City under the following statement of principle in Harrell v. DeNormandie, 26 Tex. 120, at pages 126, 127: "It is true, in general, that where a person makes a contract or does an intentional act from ignorance of the law, which otherwise he would not have done, it is nevertheless binding upon him, upon the maxim ignorantia juris non excusat. For then the contract or act is what the party intended it should be; and a court of equity will not relieve by substituting something else which was not intended. But that is very different from a case of mutual error or mistake, which defeats the real intention of the contracting parties. A contract thus made in mutual error is wanting in one of the essential elements of a contract. 'Contracts made in mutual error under circumstances material to their character and consequences seem upon general principles invalid.' 1 Story Eq.Jur. Sec. 134." The mutual mistake of Moore and the City has, in effect, defeated the intention of the contracting parties.

This view was also expressed in Moreland v. Atchison, 19 Tex. 303, at pages 309, 310, and Ramey v. Allison, 64 Tex. 697 at page 703.

And it is the view expressed in Black on Cancellation and Rescission, Vol. 1, page 413, Sec. 152.

There are analogous authorities.

In Merryfield v. Willson, 14 Tex. 224, 65 Am.Dec. 117, the defendant agreed to transfer to plaintiff his certificate as a colonist in Peters Colony or to procure for him elsewhere a colonist's headright certificate, and plaintiff paid defendant the agreed con-

sideration. The plaintiff then brought an action to recover the price paid defendant. It was held that these colonist's certificates were nonassignable under the law and that defendant had engaged to perform an act which he did not have legal capacity to perform. On equitable principles expressed in quotations hereinbefore made, the plaintiff could recover the purchase price. Said the court: "Here the money had been paid as a consideration for doing an act for the use of the plaintiff which the defendant could not perform. The contract was doubtless made in ignorance of the defendant's legal inability to perform the act. But when it was ascertained, the defendant was bound in equity and good conscience to refund the consideration he had received."

In Odell v. Grubstake Investment Ass'n, Tex.Civ.App., 38 S.W.2d 151, the shareholders in a business trust, which had 8 years yet to run, brought a suit to dissolve the trust and wind up its affairs. The trust had been formed under a belief that shareholders could limit their personal liability by appropriate provisions in the trust agreement, and afterwards the contrary was held in this state. On rehearing (pages 152, 153 of 38 S.W.2d) the court granted the relief prayed for, on the following grounds:

"Such a contingency was never contemplated by the parties, whose minds never met in agreement upon the contract as now construed by the courts and insisted upon by appellee, whereby the parties are deprived of the very protection in consideration of which they entered into the agreement actually made. The law having thus emasculated the contract, nullified material and controlling provisions which permeate the entire agreement, destroyed the consideration moving the parties to execute it, and rendered its remaining provisions palpably unconscionable, equity should intervene to terminate the agreement in its entirety and relieve the parties of the unconscionable burdens imposed upon them by the remaining provisions. We conclude that the record presents a case entitling appellants to cancellation of the contract, dissolution of the partnership created by the contract, to an accounting from the trustees, and to receiver for the purpose of winding up the affairs of the association."

In O'Connor v. Dew, Tex.Civ.App., 55 S.W.2d 882, plaintiff brought an action to recover money which he had loaned to defendant under an agreement that defendant would secure repayment of this money by a lien on certain land. After the agreement had been made and the money paid over to defendant the parties discovered that the land was defendant's homestead and that defendant could not create a lien on said property to secure this debt. The Court of Civil Appeals held: "In these circumstances the learned trial court was right in giving the defendant in error a judgment against him for the immediate return of the money."

It is an established rule of decision in this state that appropriate equitable relief will be granted against a mutual mistake of law in reducing an agreement to writing. The parties knowing the terms of the agreement but misconceiving the legal effect of said terms. Kelley v. Ward, 94 Tex. 289, 60 S.W. 311 (reformation); Norris v. W. C. Belcher Land Mortgage Co., 98 Tex. 176, 82 S.W. 500, at page 502, 98 Tex. 176, 83 S.W. 799; Gilbert v. Smith, Tex.Com.App., 49 S.W.2d 702, 86 A.L.R. 445 (reformation). This relief is granted because of the mistake of law and not despite it; and if equity will relieve one from a form of contract to which he did not agree, for mutual error of law in reducing his true contract to writing, equity may also relieve him from a contract to which he did not agree, for mutual error regarding the power of his vendor to convey.

It has also been held that mutual mistake regarding antecedent rights pertaining to property or contract requires equitable relief. In some cases (in addition to some hereinbefore cited) the mistake made was analogous to the mistake here regarding the City's authority to deal with the airport and the parties' knowledge of the facts. In Empire Gas & Fuel Co. v. State, Tex.Civ.App., 21 S.W.2d 376, at page 379 (affirmed 121 Tex. 138, 47 S.W.2d 265) the court held that the State's grantee of mineral land had power to lease the state's mineral interest in the land but was not authorized to receive payment for the state of the state's share of the bonus and

rental paid said grantee by an oil and gas lessee; and held further (although on different grounds) that said lessee could recover from said grantee that part of said bonus and rental which represented the state's share of the total payment. In Pierce v. Pois, Tex.Civ.App., 15 S.W.2d 1072, Pois sued Pierce for $500, the balance of the commission due him for effecting an agreement of exchange of lands between Pierce and Thurman. The agreement of exchange was made in November, 1922. Pierce and Thurman met during the succeeding January to make the agreed exchange, but Thurman's title to a part of his land was encumbered and he and Pierce then made a supplemental agreement whereby he undertook to perfect his title to this part of his land within three years and also to pay certain indebtedness on land held back by Pierce. Thurman did not comply with this agreement and the exchange was not effected in so far as this part of Thurman's land was concerned. Later, Pierce bought the omitted tract from Thurman's wife, to whom Thurman in the meantime had conveyed it. Pierce contended that Pois agreed to the modification of the original contract of exchange, and agreed that payment of the $500 should depend on Thurman's compliance with the supplemental contract and that Pois was accordingly not entitled to it because Thurman had not complied with said contract. The court held that Pois was entitled to the $500 when the original contract of exchange was made; that if he consented to the supplemental agreement between Pierce and Thurman and agreed that payment of the $500 should be contingent on Thurman's performance of said contract, he and Pierce were operating under a mutual mistake of law regarding his rights, and that he would not be bound. In Ferguson v. Mounts, Tex.Civ. App., 281 S.W. 616, Mrs. Mounts agreed to convey land to Ferguson. The parties contracted on the assumption that Mrs. Mounts was independent executrix of the estate of her deceased husband. This was a mistake; she had no power to sell independent of the probate court and could not convey such tilte as she had agreed to convey. Ferguson sued for a deposit and she contended that he had waived this defect by an agreement made after the mistake was brought to his attention. The court held, on various grounds, that there was no waiver, saying among other things that if this agreement had been made the parties were laboring under the "same mutual mistake of fact and of law as to their private rights, liabilities, and duties under it, which moved them to enter into the contract originally," and that this mistake entitled Ferguson to rescind the contract (pages 619–620).

Equitable relief has commonly been granted for misrepresentations of law. See Moreland v. Atchison, 19 Tex. 303; Ramey v. Allison, 64 Tex. 697. These two decisions involved elements of fraud but actually fraud is unnecessary; relief may be based on an innocent misrepresentation. Altgelt v. Gerbic, Tex.Civ.App., 149 S.W. 233, at page 236. In this case, one party relied upon a statement by another party who had superior means of information; the matter of his being justified in so relying is thus an element of the decision. However, there are decisions going beyond this and granting equitable relief simply because the innocent representation caused the mistake, without reference being made to justification in relying upon said statement. In Means v. Limpia Royalties, Tex. Civ.App., 115 S.W.2d 468, the plaintiffs sued Limpia Royalties, a business trust, and certain trustees thereof to set aside a royalty conveyance made in consideration of 12,-000 shares of stock in the trust. They alleged that this conveyance was induced by representations by acting trustees that the grantors would not be personally liable for the debts of the trust; and a copy of the trust agreement, attached to the petition, contained a provison exempting the grantors from liability for debts of the trust and requiring the trustees to so provide in any contract by them on behalf of the trust. They alleged further that this representation was false, but that it was made in good faith. The court held that it was false, that it was material, and that if it induced the execution of the deed, relief would be granted by way of cancellation.

It seems to us that an innocent misrepresentation by one person to an-

other, believed in and acted upon by both, where the parties are upon equal terms and no reason is shown why one should have relied more upon the other than upon his own judgment involves no more fault than any other mistake, and ought to support relief on the ground of mistake if at all. True, there seems to be an element of procuring cause in such a case on the part of the defendant which contributes to the plaintiff's predicament, and this suggests that relief can be granted because it is inequitable to allow defendant to make a profit out of a wrongful act. However, the difference between such cases and one of simple mistake is more apparent than real, for business transactions are generally initiated by one party thereto, who is thus almost always more or less the cause of the other party's mistake. That the difference comes down to one of degree, and that, regarding a matter which does not necessarily involve any fault on the defendant's part is shown by the decision in Emery v. Emery, Tex.Civ.App., 75 S.W.2d 725. There the plaintiff had acquired enforceable rights against his foster father under an oral contract for the conveyance of land; he had occupied the land for several years, had made valuable improvements, and had paid $2,385 on the purchase price of $3,500 in monthly installments as provided in said oral contract; but on the representation of an attorney for the guardian of his foster father (who had become insane and been placed under guardianship after the aforesaid rights accrued), that said plaintiff had no such rights, plaintiff entered into a written agreement with said guardian to buy the land and pay therefor the sum of $2,000. The court's opinion on motion for rehearing shows that everyone was acting in good faith and that the attorney mislead his own client as well as the plaintiff. It was held that the plaintiff could rescind the second contract of purchase and enforce his rights under the original contract on the ground of mutual mistake regarding his rights under said original agreement. This mistake was said to be analogous to a mistake of fact. While the attorney was the guardian's agent and while the act of said agent was the procuring cause of plaintiff's mistake, it affirmatively appears that the guardian was no more at fault in the matter than was the plaintiff; and the fact that both plaintiff and defendant acted in good faith and that one relied on the attorney's advice as much as the other and was as much mislead by him brings the situation so close to the ordinary case of mutual mistake that no substantial difference is apparent. Where the mistake has put the parties into a contract, executed or otherwise, which they never intended to make, we think the matter of who did the most to bring the mistake about is unimportant and that the significant fact controlling the judgment for equitable relief is the fact that the contract was never really agreed to.

Third, regarding the imposition of liability upon the City for repayment of the purchase price: The City has expended the $13,772 paid by Moore, but under the facts of this case there is no reason why liability for this sum may not be imposed upon the city. The City has a power to convey land. Through the exercise of this power, equitable rights to rescission have vested in Moore. The converse of those rights is the city's liability to repay the purchase price; the liability of the City to repay is an automatic and necessary incident to Moore's right to rescind. If Moore can not recover the price from the City, he has been deprived of whatever value attached to his right of rescission and thus has been deprived of the substance of that right. The City's liability to repay thus goes back to its power to convey land; for said liability exists as a consequence of that power and an actual and partially effective exercise thereof, and may be enforced as such. The liability of the city is but an element of the power of a court of equity to give complete relief to the parties and we do not think there is any question of implied contract in the case. However, it may be noted in this connection that where money has been deposited with the city to insure the performance of an illegal contract, the depositor has been allowed to recover the money deposited. City of Lubbock v. Geo. L. Simpson & Co., Tex.Civ.App., 31 S.W.2d 665. There the court said (page 669) : "The city could not have held the $7,500 deposited with it to insure the performance by appel-

lee of the contract because such contract was illegal and void and could not have been enforced by the city and appellee could have recovered such deposit." Further, where one has delivered property to the city under an ultra vires contract of sale and has brought an action to recover said property from the city, the courts have imposed upon the city a liability for the reasonable value of the use of said property during the time it was in the city's possession. Fabric Fire Hose Co. v. City of Teague, Tex.Civ. App., 152 S.W. 506; Mineralized Rubber Co. v. Cleburne, 22 Tex.Civ.App., 621, 56 S.W. 220; City of Floydada v. American La France & Foamite Industries, 5 Cir., 87 F.2d 820. If the courts can impose liability under these circumstances no reason is perceived why that liability should be denied here. It may be that expenditure of the $13,772 for an unlawful purpose would prevent the imposition of this liability, but this question is not in the case; Moore has alleged that the $13,772 was spent for "municipal purposes."

 Under the foregoing reasoning there is no question of limitation in the case as now presented because the four year statute, namely, Article 5529, R.S.1925, applies to the action for rescission and the City's exception to Moore's petition have not raised this statute. On the interpretation of Article 5529 see Deaton v. Rush, 113 Tex. 176, 252 S.W. 1025, at page 1032, and Kimmell v. Tipton, Tex.Civ.App., 142 S.W.2d 421, 427, at page 431 (Par. 9). Further, this suit was filed in time. This suit was filed on September 26, 1939, which was less than four years after the land was conveyed to Moore. Moore amended his petition; he is before the court on his second amended original petition, but the amendment alleges the same basic facts which are alleged in the original petition and thus states the same basic cause of action. The original petition did not expressly pray for cancellation while the amendment does, but the amendment has only elaborated the original prayer; Moore prayed for recovery of his money and for general relief, and the judgment prayed for could not have been rendered without rescission of the contract. See Gossett v. Manley, Tex.Civ.App., 43 S.W.2d 622.

Rescission was thus consistent with the object of Moore's suit as originally pleaded and could have been granted under the prayer for general relief, being such relief as the facts supported. See Hagelstein v. Blaschke, Tex.Civ.App., 149 S.W. 718, at page 721; 7 Texas Jur. 978, Sec. 57 and page 1008 Sec. 75; 25 Tex.Jur. 515, Sec. 124; 33 Tex.Jur. 470, Sec. 49. The amendment was to some extent only formal; if it be regarded as an enlargement of the remedies, that was permissible and did not state a new cause of action. Home Investment Co. v. Strange, 109 Tex. 342, 195 S.W. 849, page 851 (1, 2); Becker v. Directors of Gulf City Street Ry. & Real Estate Co., 80 Tex. 475, 15 S.W. 1094; 28 Tex.Jur. 223 (Secs. 124, 125); Article 5539b, Vernon's Civil Statutes.

No question of laches is before us. However, we deem it proper to say that Moore's petition shows that he never ratified the City's defective conveyance; instead he litigated the matter with the objecting parties, as he had a right to do, and when final judgment was rendered against him, presented his demand for repayment.

Moore has not offered to reconvey to the City the property which he acquired under the City's deeds. However, he has prayed for cancellation and his failure to tender a reconveyance has not been excepted to. His pleading manifests a willingness that the City shall be restored to its original position and under the circumstances the failure to formally tender a reconveyance seems to be only a matter of form and need not be given any special significance. See Rule 90.

The trial court accordingly erred in dismissing plaintiff's suit and the trial court's judgment is reversed and the case is remanded to the trial court for further proceedings in accordance with this opinion.

### On Motion for Rehearing.

We have the following comments to make regarding the matters assigned as error in the City's motion for rehearing:

(1) In various paragraphs of the motion, perhaps most directly in paragraph 28, the point is made that equitable relief against a contract, for mutual mistake of law by the parties to that contract, does not run

against a municipal corporation, the powers whereof are specified in the law and open to all men, even though it may run between private individuals.

In paragraphs 42 and 46, inclusive, and in paragraph 47, the City refers to a statement in our original opinion, that "it is always the business of one who deals with the city to ascertain what agreements city officers can, and cannot make, and be governed accordingly." This statement is then applied to various holdings made in our original opinion, and on this basis the City says that we erred in granting "any relief herein based upon the purported right of rescission." The point made seems to be that the language quoted is inconsistent with a decree granting Moore a rescission because of a mistake of law regarding the City's powers.

We think our judgment good against both arguments.

The principles which support equitable relief between private individuals against their contracts, for mutual mistake of law, can be applied here between Moore and the City upon precisely the same grounds that the City is held liable for torts. For the torts of city officers which are incidental to the exercise of corporate, as distinguished from governmental powers, the City is liable in damages. The liability rests upon the common law; in effect the city is treated as a private corporation and the city's officers are treated as agents. City of Galveston v. Posnainsky, 62 Tex. 118, 50 Am.Rep. 517; Bauguss v. City of Atlanta, 74 Tex. 629, 12 S.W. 750; White v. City of San Antonio, 94 Tex. 313, 60 S.W. 426; City of Amarillo v. Ware, 120 Tex. 456, 40 S.W.2d 57. So may the City and the City's officers be treated in determining whether rescission shall be granted Moore and whether the City shall be required to repay the purchase price of the royalty to Moore. The operation of the airport was a corporate and not a governmental function. Christopher v. City of El Paso, Tex.Civ.App., 98 S.W. 2d 394. And the sale of the royalty to Moore involved the exercise of a corporate, and not a governmental power. No matter how closely related in point of time,

the exercise of the City's power to abandon a part of the airport and the exercise of the City's power to sell its property are distinct and separate matters; and Moore's transaction with the City was nothing but a purchase and sale of the City's property.

Nor do we see any inconsistency between such a holding and our statement that "it is always the business of one who deals with the city to ascertain what agreements City officers can, and can not make, and be governed accordingly." It is also the business of individuals to know the law when they come to make contracts, yet equity sometimes grants relief against these contracts for the parties' mutual mistake of law, and the relief has not been thought to be inconsistent with the obligation.

The existence and extent of the City's powers are matters of law, and mistaken views of these powers, by city officers and by individuals who deal with the City, are inevitable. It seems very often to be true that the mistake prevents any contract being made; the transaction is generally void and the question of rescission does not appear because a contract is a prerequisite to any right of rescission. As said of the ultra vires contract before the court in Causeway Inv. Co. v. Nass, 131 Tex. 12, 111 S.W.2d 703, at page 704 (1–2): "It could not be rescinded because there was nothing to rescind." Now we have referred to decisions in our original opinion which establish enforcible rights against the city in favor of the individual who attempted to make certain contracts with the city; we have listed judgments awarding the individual property which he had delivered to the city under a void contract of sale, judgments decreeing him the rental value of said property while used by the city, and a judgment awarding him money deposited by him with the city. To these authorities we add the decision in Southwestern Lloyds v. City of Wheeler, 130 Tex. 492, 109 S.W.2d 739 (Court of Civil Appeals' opinion reported, City of Wheeler v. Southwestern Lloyds, 81 S.W.2d 188) holding the city liable for the reasonable value of sanitary equipment sold and delivered to the city under a contract, void be-

cause not supported by a tax levied to pay future installments of the purchase price. It seems that the courts were attempting as best they could to restore the individual to the position he occupied before he entered into the transaction; and this is suggestive because the parties, at least roughly, occupied a position like that which they would have occupied upon a decree of simple rescission. The case before us differs from all these cases because the transaction here was not void. Moore got a royalty, but this royalty was covered up with a "dedication" to the bond purpose which made his position speculative beyond the degree contracted for by him. To deny him rescission is, in effect, to enforce against him a contract which the parties did not make, and therefore it is proper to set the contract aside. The City having acted in its corporate capacity in selling the royalty to him. Having done so, it is then proper for the court to do precisely what the courts have done in the cases just referred to, namely, restore him his property, his money. Viewing the matter broadly, we think our judgment is but a logical extension of the City's unquestioned liability to return property delivered to it under a void contract of purchase and sale.

This result should give the City no ground for complaint. The judgment imposes no contract upon the City which the City could not make nor does it occasion the City any loss; all we have done is to set aside a contract which operated upon the parties in a way they did not contemplate, and to then restore them to the status quo ante.

(2) In paragraphs 1 and 14 of the motion, to which paragraphs 13 and 18 seem related, the City assigns error to our conclusion that if the City's lease to Landry had been void, Moore's deed would have vested him with title to two interests, namely, an interest in the City's lease royalties and an interest in the City's possibility of reverter which would have automatically expanded into a 1/16th royalty when the lease terminated.

Our statements regarding the way and manner in which Moore's deed would have operated upon the City's various interests under a valid lease to Landry were based upon two propositions: (a) The City's possibility of reverter was not limited to the lessee's working interest but extended throughout the City's fee in the minerals and underlay the royalties reserved to the City in the lease; and (b) the City's possibility of reverter was equivalent to the sum total of all rights, powers and interests granted the lessee; it was a composite interest, as is a determinable fee or a fee simple, and included a reverter to every right, power and interest granted the lessee; therefore the City, not being compelled to convey all or nothing, could convey a royalty out of the reverter in fee, just as the fee owner can convey a royalty out of the minerals before a lease.

The first of the propositions just mentioned—that the possibility of reverter ran throughout the mineral fee of the lessor and underlay the lessor's royalties—was based upon what seemed to be a common recognition in this state of the lessor's lease royalties as amounting to a distinct and identifiable interest in land—which necessarily expired with the lease. See: Hoffman v. Magnolia Petroleum Co., Tex.Com. App., 273 S.W. 828; Richardson v. Hart, Tex.Sup., 185 S.W.2d 563, 564. The integrated character of this interest, or combination of interests, is indicated by the following statement, taken from Richardson v. Hart, referring to a conveyance of a fractional part of the minerals in place, subject to a lease but including a fractional part of the lease royalty: "It is clear, we think, that the instrument conveyed two separate and distinct estates in the land. The first was a permanent interest in the minerals in place which was to subsist during and beyond the life of the existing lease. The other was the royalty to be due and payable under the lease." And it has been held that the interest conveyed under a conveyance of a lease royalty terminated with the lease. Curlee v. Anderson, Tex.Civ.App., 235 S.W. 622.

In Tennant v. Dunn, 130 Tex. 285, 110 S. W.2d 53, at page 57 (followed in McLean v. State, Tex.Civ.App., 181 S.W.2d 725), the lessor's royalties were described as profits, in the following language: "The gist of

the opinion in Sheffield v. Hogg [124 Tex. 290, 77 S.W.2d 1021] is that oil and gas royalties, whether payable in kind or in money, and whether arising from the ordinary lease of land in which the lessor owns the minerals, or from a lease made under the Relinquishment Act, should be adjudged to be present interests in land rather than mere rights in personality at some uncertain date, because they are profits arising out of land, and, further, because such classification, which accords with the practice in the oil and gas industry, furnishes a stability highly important, if not essential, to the structure of that business."

If the royalties reserved by a lessor are profits, these profits expire when the lease expires. The lessor no longer owns a profit; he owns again the estate vested in him when he leased the land, and it seems more reasonable to say that the lessor reacquired his full estate by way of reversion instead of by a combination of ways, namely, a reversion of the lessee's interest, which merges with the profit, that is, the lease royalty, to produce the estate owned before the lease was made.

Nevertheless, the following statement from Murphy v. Dilworth, 137 Tex. 32, 151 S.W.2d 1004, at page 1006, indicates that the lessor's royalty is something more than a profit, and that is might be, instead, equivalent to ownership of minerals in place subject to a right vested in the lessee to buy, sell, or deliver the royalty minerals when produced: "The outstanding lease had the effect of placing the title in the lessee to 7/8 of the minerals for the purpose of exploration and development, but subject to reversion upon termination of the lease; and of retaining in the lessor the title to 1/8 of the minerals with the possibility of reversion of the remaining 7/8 interest. Sheffield v. Hogg * * *."

If the language just quoted from Murphy v. Dilworth is applied literally, there seems to be no obvious reason why a simple conveyance of the lease royalty would not vest title in fee to a fractional interest in the minerals in place, as distinguished from an interest which would expire with the lease and as distinguished from a pure royalty such as the court had before them in Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543. Yet we have seen no decision from a court of this state so holding, and we are not persuaded that Murphy v. Dilworth was intended to have this effect. The quotation made above from Richardson v. Hart indicates the contrary. Furthermore, if lessor really owns 1/8 of the minerals in place under a royalty reservation of 1/8, and a possibility of reverter under the remaining 7/8 of the minerals, it is hard to see why a conveyance in fee of, say, 1/24 of the minerals in place would not be taken in full out of said 1/8 royalty. For it seems logical to say that conveyance of minerals should be charged against minerals and not against reverter, a different kind of estate. Yet in Theo Oil Co. v. Thomas, Tex.Civ.App., 108 S.W.2d 555 (cited and apparently followed in Murphy v. Dilworth) the court held that the grantee of a 1/24 fee interest in the minerals in place took title to only a 1/24 of the 1/8 royalty reserved by his grantor in a lease outstanding when his deed was executed and delivered, that is, to a 1/192 royalty in the tract. (And this was the holding of the court in Richardson v. Hart, Tex.Sup., 185 S.W.2d 563, supra.) Thus the court charged the grantee's 1/24 mineral fee against both the grantor's possibility of reverter and his royalty; and grantee necessarily got 1/24 of the reverter as he did 1/24 of the royalty. The decision implies that royalty and reverter had to be combined to make out the 1/24 fee, and this combination, from the difference (under any theory) in the types of interests involved, seems to us to further imply that the royalty and reverter were needed to make up the *estate* granted in the minerals, as distinguished from the fraction of the minerals conveyed. Thus the judgments in Theo Oil Co. v. Thomas, Richardson v. Hart, and perhaps in Murphy v. Dilworth as well seems to support our conclusion that the lessor's lease royalties do not constitute a true ownership of minerals in place, but something else, which is incidental to and which terminates with the lease.

At any rate, regardless of what lies beneath the lease royalties reserved by

the lessor, and regardless of the process whereby the estate owned by the lessor when he made the lease gets back to him when the lease terminates, we are still of the opinion that said royalties, at least under the ordinary mining lease used in this State, either are in fact or else include in fact interests in land which are incidental to the lease and which expire with the lease. We are accordingly still of the opinion that Moore and the City were mistaken regarding the property interests available for transfer by the City. It is unnecessary for us to express any opinion regarding the way in which the City's royalty deed would have operated upon the City's interests under a valid lease to effectually vest Moore with title to a perpetual royalty; and we withdraw the statements in our opinion that this deed would have conveyed to Moore an interest in the City's possibility of reverter under a valid lease.

Our remarks concerning the operation of Moore's royalty deed upon interests remaining in the City under a valid lease were made primarily, to describe fully the nature of the mistake the parties made. On this record Moore's principal injury, or at least what we regard as sufficient injury, resulted from his royalty being covered up with the socalled "dedication" of the airport tract to the purpose of the bonds which paid for it. Moore's enjoyment of his royalty was not only subject to the contingencies incidental to royalty in privately owned lands; because of the "dedication", it was also subject to the contingency of the City's abandoning the airport. Thus Moore could not rely upon the lease-right owner's self interest persuading that owner to lease the land eventually nor could he rely upon any possible implication of a right to compel said owner to lease the land. As we said in our original opinion: "The royalty (Moore) got was burdened with a dedication which made enjoyment thereof contingent beyond the degree contracted for and subjected him to a speculation of such a nature as to make what he got different in quality and kind from what he bought." As we view the matter, Moore suffered material harm regardless of whether he and the City made a mistake about the interests available for transfer by the City, although that mistake certainly contributed to the injury he suffered.

For the reasons just stated, if for no other, it is of no significance that the City's lease to Landry has expired.

We adhere to our holding, and to the reasoning on which that holding is based, that the City's deed vested Moore with title to a royalty, subject to the contingencies noted in our original opinion. A general, potential power of conveyance by the City existed under the charter provision and the City's fee simple ownership alleged by Moore. See generally: Adams v. Dignowity, 8 Tex.Civ.App. 201, 28 S.W. 373, at pages 379, 380; Abbott v. City of Galveston, 97 Tex. 474, 79 S.W. 1064. This power, at least when construed with the power to lease granted by Art. 1267, R.S. 1925, included the potential power to convey a mineral interest in lands which the City was not forbidden to lease by that statute. At the time of the transaction between Moore and the City, Chapter 83, Acts of the 41st Legislature, 1st called Sess., Vernon's Ann.Civ.St. art. 1269h, authorizing cities to acquire airports, was in force as originally enacted; it contained no provision which might be construed as a limitation upon the City's power to convey. On this basis, and having in mind the decision in Town of Refugio v. Strauch, Tex.Com.App., 29 S.W.2d 1041, we have not been able to perceive any reason why the deed to Moore, or why a mineral lease or any other conveyance of any other interest in the airport should be defeated except by reason of the following matters: (1) The land represents the proceeds of bonds voted for a specific purpose and therefore can not be devoted to another use which is inconsistent in fact with use for the bond purpose, until the court can say that the use of the land for that purpose had been abandoned (and we see no reason why the city would have to evacuate the airport to make out an abandonment in fact), and (2) the City can not agree, either expressly or by necessary implication, to abandon use of the land for the bond purpose at a future time. In the case of an airport, a mineral lease of the airport tract presupposes operations which

will interfere with use of the land for an airport and is accordingly invalid because it necessarily implies that, sooner or later, the City will abandon use of the land for the bond purpose at the will of the lessee. A conveyance of any other interest in the airport, other than a royalty, might be invalid for substantially the same reason. We refer, of course, to conveyances and leases, made before and not after or co-incidental with, an abandonment of the airport or a segregated part thereof.

But outstanding ownership of a royalty in the airport can not interfere with the City's use of the land for an airport because the City, and not the royalty owner, determines when use of the land shall be abandoned and when a lease shall be made. Perhaps, as we have said in our original opinion, there will be circumstances when a court, at the prayer of a royalty owner, will compel the owner of the lease right to make a lease; but if these circumstances ever arise, the court will act under some principle of equity jurisprudence and not under some rule of land law. And a court of equity would not grant relief which would divert the proceeds of the airport bonds from the purpose of those bonds, nor would that court, in effect, require the City to exercise the discretion to abandon the airport.

Private ownership of royalty can not tend, in any appreciable degree, to impel the misuse or abandonment of the airport— that result might be brought about by the possibility of profit to the City from a lease by the City, but Moore's outstanding royalty would lessen the value of a lease by the City and might actually have some tendency to delay an abandonment of the airport. Moore, as any other private owner, might attempt to persuade the City to lease the land; but if the possibility of City officers being persuaded to act erroneously destroys a power, the City would have no powers.

It seems to us that we would have to hold that the City's deed to Moore was against public policy to wholly defeat it; and the Legislature, by enacting Art. 1267, has laid down exactly the opposite as the public policy of this State. For the leases authorized by that statute are conveyances of mineral interests to private individuals; and

under the reasoning stated in our original opinion, we think it is necessarily to be implied that the City had a right to convey the royalty to Moore subject, always, to the contingencies noted in said opinion.

(3) We are satisfied with our disposition of other matters referred to in the motion for rehearing.

The motion for rehearing is accordingly overruled.